(No. 6968. May 13, 1942.)

CHARLES H. MALCOLM, in his capacity as Administrator of the Estate of E. M. Christensen, deceased, substituted as appellant in the place and stead of E. M. Christensen, Appellant, v. F. W. HANMER, in his capacity as Trustee, in place of E. W. Whitcomb, Trustee, deceased; C. W. POPE, E. J. PAGE and ELIZABETH PAGE, his wife, CONDOR GOLD MINING COMPANY, a corporation, BUCK HORN GOLD CORPORATION, a corporation, TREASURE GOLD MINING COMPANY, a corporation, and AMERICAN NATIONAL BANK, a corporation, Respondents.

[127 Pac. (2d) 331.]

Rehearing denied July 9, 1942.

L. E. Glennon, Jones, Pomeroy & Jones and F. A. McCall for appellant.

John W. Jones for respondents, C. W. Pope, E. J. Page and Elizabeth Page.

HOLDEN, J.—E. M. Christensen lived in Lemhi county from 1896 to the day of his death. He was a hard rock miner. Respondents C. W. Pope and E. J. Page (a lawyer and member of the law firm of Page & Lay) were residents of the State of New York.

September 14, 1921, Pope wrote Christensen the following letter:

"I have your favor of September 8th in which you refer to a letter in answer to mine enclosing a copy of Mr. Casterlin's letter to me; I have not received this letter of yours.

"However, after giving the matter thought, I have decided to ask you if you are willing to do the following things:

"1st. Take over the handling of the property from me with the understanding that I am to put no more money into it. That you will finance it from sales of property on grounds, or what you may be able to collect from Mr. Merritt or anyone else owning the company's money (owing the company money?).

"2nd. That you will adjust all matters in Idaho in connection with the death of the watchman under the laws of Idaho which provide that an employee must start action within sixty *dyas,* and that if he lets it run longer, it is at his risk.

"If you will do the above, I will agree to give you a one-half interest of my interest in the entire property which really amounts to the ownership in view of the fact that the MANDARIN MINES is heavily indebted to me from money advanced. In fact, the YELLOW JACKET and the MANDARIN MINES owe me something over $30,000. for cash advanced.

"If this appeals to you, please advise me at once and I will write you, authorizing you to handle the whole thing as

your best judgment dictates, both as to handling the property in the future and to realizing on the present assets and claims that are due the company.

"(Signed)   C. W. Pope."

Shortly after the receipt of that letter, to-wit, in October 1921, and pursuant thereto, Christensen took possession of the property therein mentioned. Thereafter, the record does not disclose just when, Pope assigned his claims against "Mandarin Mines" (covering the indebtedness referred to in the above quoted letter) to one Lancaster. Lancaster then prosecuted such claims to judgment in the State of New York, after which he prosecuted an action on the New York judgment in the District Court for Lemhi County, and recovered therein a judgment against "Mandarin Mines". An execution was issued on the Idaho judgment and the property mentioned in the letter, located in that county, was sold at sheriff's sale, whereupon a certificate of sale was issued to Lancaster, who then assigned the certificate to Page. Upon the expiration of the period of redemption, a sheriff's deed issued to Page.

In March, 1925, Christensen entered into a "bond and lease" with Charles Peters and W. F. Hayden. Peters and Hayden operated the mining property and constructed valuable improvements thereon in the name of the New York-Idaho Exploration Company. The operation and development covered a period of a little more than a year, but no actual transfer of the property was consummated under that instrument.

July 7, 1928, respondent Page, joined by his wife, executed and delivered a trust deed, covering the property involved in the case at bar, to E. W. Whitcomb.

August 28, 1928, Christensen executed a release to Page which recites a consideration "of the sum of one dollar ($1.00) and other good and valuable consideration," the pertinent provisions of which are:

"* * * and in particular from any and all claim or claims which I have or may have on account of any matter or thing connected with, arising out of or in any way related to the Mandarin Mines or Yellow Jacket Mining properties so-called because of or on account of any act or omission of said E. J. Page in connection with said mines, mining claims or his ownership thereof."

February 7, 1935, Whitcomb, as trustee, entered into a "Title Bond and Lease of Mining Properties" with H. B. Rigby and Royal Garn for the sale of the property in question, for the sum of $80,000, which contract was thereafter assigned by Rigby and Garn to respondent Buck Horn Gold Corporation (after such assignment the contract was modified by providing the unpaid balance of the purchase price, to-wit, $78,527.39, might be paid in certain stated instalments), which corporation thereafter assigned and transferred the contract to respondent Treasure Gold Mining Company and that company then assigned the contract to respondent Condor Gold Mining Company.

March 25, 1937, trustee Whitcomb quitclaimed the mining property to respondent Page. September 1, 1937, respondent Page, joined by his wife, executed and delivered a second trust deed to Whitcomb covering the same property, but omitted from that deed the provisions (hereinafter quoted) incorporated in the first trust deed which recognized, acknowledged and declared Christensen's interest in the mining property.

This suit was later commenced by Christensen to obtain a decree adjudging him to be the equitable owner of an undivided half interest in the property and the proceeds of the sale thereof. Upon a trial of the cause the court made and entered Findings of Fact and Conclusions of Law against plaintiff Christensen, and in favor of the respondents, and final judgment was entered thereon from which Christensen appealed. Thereafter Christensen died and his administrator, Charles H. Malcolm, was substituted as appellant.

In limine it may be stated that a discussion of the very numerous contentions made by the respective parties would result in extending this opinion far beyond reasonable limits and would, furthermore, serve no useful purpose. And, while the record presents the question as to whether the trial court erred in striking plaintiff's exhibits "E", "F", "J", "K" and "L", which will later be discussed, still and nevertheless, whether the judgment appealed from should be reversed or affirmed depends upon the determination of these questions:

(1) Is Pope, in truth and in fact, the owner of the property in controversy?

(2) Did he contract to give Christensen a half interest in such property?

(3) Did Page take title to the property in trust for Pope and Christensen?

█ Considerable correspondence followed Pope's letter to Christensen dated September 14th, 1921 (hereinbefore set forth). That deemed pertinent to the discussion of those questions follow:

Letter from C. W. Pope to E. M. Christensen dated September 29th, 1921:

"I have your favor of the 20th and in reply beg to advise you that there are no claims against the MANDARIN MINES CORPORATION other than taxes which are running and which will not be due, I believe, for about two years; I have paid them in my own name about one and one-half years ago some $900., so that this matter will I think, show a clean slate should it become necessary to clean up the mess.

"Under the terms of the sale of the Yellow Jacket to the MANDARIN MINES CORPORATION, the Yellow Jacket received 300,000 shares of MANDARIN MINES stock; however, the Yellow Jacket Company owes me on notes that I hold about $25,000. Principal and interest has never been paid which of course, would in a windup give me title to the 300,000 shares of MANDARIN MINES CORPORATION of the Yellow Jacket's.

"The MANDARIN MINES owes me about $15,000., money advanced by me to pay taxes and watchman; as there are only some twenty stockholders, there is no chance of this money being paid so that I already own the balance of the MANDARIN MINES stock not owned by these twenty stockholders, so therefore, only legal process would be necessary to get the entire title.

"This is my position and it is in this position that I offer you a one-half interest. From the above, you will see that it will be necessary for me to get something around $40,000. out of the property in order to get my money back out of my one-half interest. I am not stating this figure as something that I want but I am willing to turn my position over to you to work out and give you a one-half interest in whatever is done to work the situation out.

"(Signed) C. W. Pope."

Letter (Plaintiff's Exhibit "F") from E. J. Page to E. M. Christensen dated June 23rd, 1924:

"* * * * In order to avoid the necessity of paying money upon the sale, I suggest that you should bid, or have Mr. Whitcomb bid in the name of the plaintiff in the action, Mr. George A. Lancaster.

"* * * I am writing to about the same effect, so far as the bidding in the name of Mr. Lancaster is concerned, to Messrs. Whitcomb, Cowen & Clark who will, I expect, be present at the sale for the purpose of protecting the interests of Mr. Lancaster, and, when they are protected, the interests of yourself and Mr. Pope are likewise protected.

"(Signed)    E. J. Page."

Letter from C. W. Pope to E. M. Christensen dated February 19, 1925:

"* * * I was present when Mr. Page wrote your power of attorney bringing Mr. Whitcomb into it and I know that his reasons were to entirely protect you and myself from any 'tricky' dealing from the other side. In other words, he wanted a lawyer to see that no expenses were piled up against either you, I, or the property in dealing with these people.

"You must realize, Mr. Christensen, that I have given you a half interest in my interest in this property, which has cost me a good deal of money and I myself believe it will be a very valuable property if it is worked, which is by way of saying that I have trusted you implicitly and do trust you implicitly, but you see, unfortunately, we have neither of us had an opportunity to talk to each other and you have never seen Judge Page and talked to him—if you had, your attitude would be different. You would find him a most respected and substantial man, entirely devoted to my interest, which in this particular case would be your interest.

"* * * * * *

"You must understand, of course, that it was my money and my claims which I advanced to the Mandarin, and which I assigned to Mr. Lancaster on which he foreclosed and further I have spent some money on this—I don't know how much, but it amounts to several hundred dollars of expense and of course, I will have to pay Page & Lay for

their services eventually, but they are willing to wait to get their pay out of the proceeds of the property.

"* * * * * *

"(Signed)   C. W. Pope."

Letter from C. W. Pope to E. M. Christensen dated June 24th, 1925:

"Enclosed please find a letter which I have just written to Messrs. Whitcomb, Cowen and Clark. It is self-explanatory and I trust you will be able very shortly to get in touch with them concerning its contents.

"(Signed)   C. W. Pope."

Letter (enclosed in the last above quoted letter) from C. W. Pope to Messrs. Whitcomb, Cowen and Clark dated June 25, 1925:

"* * * * I gave Mr. Christiansen a one-half (½) interest in my interest in the Mandarin Mines Company, with the stipulation on my part that he would protect the company and bear the expense of protecting the property, my interest in which was almost the entire property, and became the entire property thru the foreclosure of the Mandarin Mines Company, on sheriff's deed of sale, which I understand will be delivered now almost any time.

"* * * * The expenses to date, while they are not large for your services, have been borne by me, which I think should under the agreement have been paid by Mr. Christiansen—in other words, I gave him one-half interest in a property of very considerable size and undoubtedly of considerable present value in return for his good offices.

"* * * * So if you will get in touch with Mr. Christiansen and he is agreeable, I suggest, if you are willing, that you do what you can to protect the interest of Mr. Christiansen, your client, taking your pay out of the proceeds of what is realized from the sale of the entire property.

"I trust this statement of agreement between Mr. Christiansen (Christensen) and myself will be sufficient to warrant your acting for him, and I have no thought whatever of being dissatisfied with his handling of the matter, on the contrary, I want him to handle it and to the best advantage at the earliest possible moment and any deal you may make with him to help do this, I would, of course, like to know about, but I would be willing to approve immediately.

I forwarded to Judge Page the other day, to forward it to you, check for your last bill, which I understand closed the present arrangements and your claims against me and I will entirely appreciate your telling me frankly just what your attitude is at the earliest moment toward facilitating the protecting and closing up of the whole matter."

Letter (Plaintiff's Exhibit "E") from C. W. Pope to E. M. Christensen dated October 8th, 1926:

"* * * * I would be glad to help you out at this time if I could but I have spent considerable money myself in trying to get this thing in shape and I don't really believe that there will be any serious trouble from any other claimants, as the fact that you set forth in your letter should be very easily proven. We have two sheriff deeds for the property and I have already sent Senator Whitcomb the tax receipts. * * *

"(Signed)  C. W. Pope."

Letter (Plaintiff's Exhibit "J") from E. J. Page to E. M. Christensen dated April 13th, 1927:

"* * * My position in regard to the Yellow Jacket property today is the same as it was when the title first came in to me, and the same as it has been at all times between those dates. And that position is, that I am prepared to sign any paper, deed, conveyance or agreement necessary to carry out any arrangements made by yourself and Mr. Pope, or agreeable to both of you, in reference to the handling of this property or the disposal of it, so long as such signing does not involve me in any personal responsibility. Whenever you and Mr. Pope say the word, I am ready to convey; but, in view of the statements in regard to claims which you make in your letter, and in view of the claims made by Mr. Hall in his letter, I am not prepared to warrant the title. * * *

"(Signed)  E. J. Page."

Letter (Plaintiff's Exhibit "K") from E. J. Page to E. M. Christensen dated June 22nd, 1927:

"* * * * and, as I have said before, I am entirely willing to protect you exactly along the line of your agreement with Mr. Pope, but please bear in mind that, while you are demanding a power of attorney from me, you have no contract with me nor anything entitling you to negotiate in regard to the property, except my statement (which is

perfectly valid) that I am willing to protect you in the same way that you were protected by Mr. Pope on your contract and while he had power to deal. The point is not in my insisting in being the owner of record of the property. I am the owner of record but I have no wish to remain so. "* * *

"Permit me to state also, at this time, that in the event that you are able to sell the property, I agree that you shall have such part of the consideration as was agreed upon in your contract with Mr. Pope and for the consideration also that you keep the taxes paid and do all other things which you agreed with Mr. Pope that you would do. I will act in concert with you, either directly or through Senator Whitcomb, in consummating a sale of the property. * * * *
                    "(Signed)   E. J. Page."

Letter (Plaintiff's Exhibit "L") from C. W. Pope to E. M. Christensen dated July 16th, 1929:

"* * * First, please understand that Judge Page only entered this business at my request as a courtesy to carry out the things that were necessary to do in order to meet the terms of my agreement with you, which he knew of, and which I have repeatedly confirmed to both you and Judge Page, and I believe, through Judge Page, to Senator Whitcomb.

"I never heard of Senator Whitcomb other than through you. You vouched for him very highly and it is my information he is an absolutely dependable man, and for the purpose only of satisfying you and quieting your mind the property was deeded to him in trust to carry out the provision of a satisfactory deal that you might make, for, of course, the deal should be satisfactory to me.

"Under our original agreement you were to receive a one-half interest in my interest in this property, provided you would take it over and protect it and sell it, and I do wish you would clear the matter up and get us both out at the earliest possible moment for as large a profit as you possibly can, and accept my assurance that there is no intent that I know of in any shape, manner or form to, in the slightest degree, deprive you of any of your rights under our original agreement, but I do think it is up to you to do all the protecting that you can and arrange the sale at the earliest possible moment for both our sakes.
                    "(Signed)   C. W. Pope."

Under Pope's promise to give Christensen a half interest in his (Pope's) interest "in the entire property", Christensen entered into possession of the mining property. While in possession he negotiated a satisfactory settlement of the claim arising out of the death of a watchman (the claim mentioned by Pope in his letter to Christensen dated September 14th, 1921); in addition to that, Christensen generally managed, took care of and protected the property, supervised and paid for a large amount of labor performed on the property and in doing assessment work, fixed by Christensen at approximately $8,000, and paid taxes assessed against the property to the amount of $2,100 out of his own money.

While it is true that at the time Pope promised to give Christensen a half interest "in the entire property," the property referred to stood on the record in the name of "Mandarin Mines"; it is also true, that thereafter and during the period Christensen was in possession, managing the property, and spending substantial sums of his own money for labor and taxes (under the beguiling representations of both Pope and Page), Pope, not Page, in truth and in fact, acquired all the property of "Mandarin Mines" involved in this suit, by causing such property to be subjected to the satisfaction of his claims, and paying the expenses and attorney fees incident thereto, as appears from the above quoted correspondence, particularly the following:

June 23rd, 1924, Page wrote Christensen saying "I am writing to * * * Whitcomb, Cowen and Clark who will I expect, be present at the sale (referring to the pending sale of the property on execution), for the purpose of protecting the interests of Mr. Lancaster, and when they are protected, the interest of *yourself* and *Mr. Pope* are likewise protected;" February 19th, 1925, Pope wrote Christensen that he (Christensen) had "never seen Judge Page (one of the respondents herein) and talked to him—if you had, your attitude would be different. You would find him a most respected and substantial man, entirely devoted to *my interest*, which in this particular case would be *your interest*," and that he, Christensen, "must understand," "*that it was my* (Pope's) *money and my claims which I advanced to the Mandarin and which I assigned to Mr. Lancaster on which he foreclosed, and further I have spent some money on this, I don't know how much, but it amounts*

to several hundred dollars of expense and of course, I will have to pay Page and Lay (indicating Page & Lay were also acting as Pope's attorneys) for their services eventually but they are willing to wait for their pay out of the proceeds of the property;" June 25th, 1925, Pope wrote Whitcomb, Cowen and Clark (and enclosed a copy of that letter with a letter to Christensen, thus making the letter to his Idaho attorneys a part of his correspondence with Christensen) that his (Pope's) interest "became the entire property thru the foreclosure of the Mandarin Mines Company, on sheriff's deed of sale, which I understand will be delivered now almost any time," and that "the expense to date, while they are not large for your (referring to Whitcomb, Cowen and Clark's) services, have been borne by me * * *;" April 13th, 1927, Page wrote Christensen that "* * * My position in regard to the Yellow Jacket property today is the same as it was when the title first came into me, and the same as it has been at all times between those dates. And that position is that I am prepared to sign any paper, deed, conveyance or agreement necessary to carry out any arrangements made by yourself and Mr. Pope or agreeable to both of you, in reference to the handling of this property or the disposal of it, so long as such signing does not involve me in any personal responsibility. Whenever you and Mr. Pope say the word, I am ready to convey; but in view of the statements in regard to claims which you make in your letter, and in view of the claims made by Mr. Hall in his letter, I am not prepared to warrant the title;" not long thereafter, to-wit, June 22nd, 1927, Page again wrote Christensen, among other things, that "I am the owner (referring to the property in question) of record but I have no wish to remain so." (Emphasis ours.)

If Page had actually owned this valuable mining property (as he now claims), he would not have voluntarily offered, as he did, to sign any paper or deed which would "carry out" any arrangement between Christensen and Pope concerning that property, nor would Page have written Christensen that while he, Page, was the "owner of record," he had "no wish to remain so." The above quoted Page letters to Christensen constitute a clear unqualified recognition and acknowledgment that he, Page, was holding title to the property in trust, and in addition to that, the letters flatly contradict Page's present claim of ownership.

Moreover, Pope's payment of the expenses and attorney fees incurred in the prosecution of his claims against "Mandarin Mines" to judgment, and the subjection of the property of "Mandarin Mines" to the payment thereof, whereby Pope supplied the claims, as well as the expenses, necessary to the acquisition of the property, is not unlike the situation created where one person pays the purchase price of property in money and the title is taken in the name of another.

In *Rexburg Lumber Company v. Purrington,* 62 Ida. 461, 113 Pac. (2d) 511, 514, we pointed out:

"This court is clearly committed to what is practically the universal doctrine that where one pays the purchase price for real property, though title be taken in the name of another, a trust arises, impressed upon the land, in favor of such party paying the purchase price. (*Branstetter v. Mann,* 6 Ida. 580, 57 Pac. 433; *Pittock v. Pittock,* 15 Ida. 426, 98 Pac. 719; *Feltham v. Blunck,* 34 Ida. 1, 198 Pac. 763; *Sherman v. Citizens' Right of Way Co.,* 37 Ida. 528, 217 Pac. 985; *Aker v. Aker,* 52 Ida. 713, 722, 20 Pac. (2d) 796; *Reid v. Keator,* 55 Ida. 172, 186, 39 Pac. (2d) 926; *Shepherd v. Bougan,* 58 Ida. 543, 553, 76 Pac. (2d) 442; 65 C.J. 396, 399; 23 C.J. 344; Laurence on Equity Jurisprudence, para. 565, p. 647; Pomeroy, Equity Jurisprudence, para. 1031, p. 2336, para. 1044, p. 2370."

Furthermore, that Pope, as early as September 29th, 1921, planned to acquire ownership of the property in question in the manner he later employed, is placed beyond serious controversy by his letter to Christensen of that date. In that letter Pope mentioned the amounts he had advanced to "Mandarin Mines Corporation," and then stated that "there is no chance of this money being paid . . . so therefore, only *legal process* would be necessary to get the entire title" (emphasis ours).

As hereinbefore pointed out, Pope offered, in substance (in his letter dated September 14th, 1921) to give Christensen a half interest in his interest "in the entire property" if Christensen would (a) "take over the handling of the property" (with the understanding that Pope would "put no more money into it"), and finance the mines from the sale of the property on the grounds, or with money which Christensen might be able to collect from persons indebted to the company, and (b) "adjust all matters in Idaho in connection with the death of the watchman."

Under that offer Christensen took "over the handling of the property", and managed it for a number of years, in the course of which he expended substantial sums of his own money, as well as money obtained from other sources, but not from Pope who personally "put no more money into it," and he also adjusted the claim arising out of the death of the watchman. This conduct on the part of Christensen not only constituted an acceptance of Pope's offer, but also and as well, to say the least, a substantial, if not a complete performance of Christensen's part of the contract. And, finally, Christensen's acceptance of Pope's offer is expressly admitted in the brief of respondents wherein they concede that "In September, 1921, the plaintiff (Christensen) having accepted the proposition submitted by said letter (referring to Pope's letter to Christensen dated September 14th, 1921), took possession of the property and maintained control of it until the year 1928, . . . ."

We conclude that Pope is, in truth and in fact, the owner of the property involved in this suit, and that Pope contracted to give Christensen a half interest in that property, and, further, that Page took title to the property in trust for Pope and Christensen, and in reaching that conclusion, we have considered the above quoted exhibits "E", "F", "J", "K" and "L", admitted in evidence but later stricken. Exhibits "E" and "L" are letters written by Pope to Christensen and Exhibits "F", "J" and "K" are letters written by Page to Christensen. None of the said letters objected to and stricken was either from or to a third party. The question, then is, did the trial court err in striking the above mentioned exhibits?

The authenticity of the letters being established (as in the case at bar) the test of admissibility is as to whether they were pertinent to and had a bearing upon the questions at issue.

"A letter, forming a part of the correspondence between the parties to an action concerning the question at issue, is admissible, it standing on the footing of a conversation between the parties." (Nichols Applied Evidence, vol. 3, sec. 19, p. 2859; to the same effect: *Crane v. Maloney*, 39 Iowa 39, 40; *Thames Loan & Trust Co. v. Belville, et al.*, 100 Ind. 309; *Hammond v. Beeson, et al.*, (Sup. Ct. Mo.) 20 S.W. 474, 477; *Frame v. Oregon Liq. Co.*, 48 Ore. 272, 85 Pac. 1009; 10 Cal. Jur. 889.)

■ Moreover:

"The general principles of evidence in respect to relevancy and competency are applicable, of course, to letters and telegrams. A contract may be embraced in letters or telegrams constituting correspondence between the parties, and such correspondence is admissible for the purpose of proving the contract and its terms and conditions." (22 C. J., sec. 1106, p. 903.)

And this court in the recent case of *Hansen v. Rainbow Mining & Milling Co.*, 52 Ida. 543, 551, 17 Pac. (2d) 335, held that:

"A contract may consist and be made up of a series of letters if connected or bearing on the same subject." (To the same effect: *Leaf v. Codd*, 41 Ida. 547, 554, 240 Pac. 593; *First Nat. Bank v. Reins*, 42 Ida. 720, 248 Pac. 9.)

■ Where a letter contains declarations and admissions against the interest of the writer, it is admissible. We held in the early case of *Work Bros. v. Kinney*, 8 Ida. 771, 71 Pac. 477, that:

"The acts and declarations of parties against their own interest, whether made in, or out of court, are admissible against them; those which are self serving, or in the interest of the parties making them, are not admissible." (To the same effect: Wigmore on Evidence (3rd Ed.), vol. IV, secs. 1048, 1049, pp. 2, 3, 4; Elliott on Evidence, vol. 1, sec. 232, p. 334.)

■ We turn now to the question as to whether Christensen actually released Page, as found by the trial court. It will be remembered that July 7th, 1928, Page, joined by his wife, executed and delivered to Whitcomb, a trust deed covering the property involved in this case. This trust deed provided that:

"* * * any balance thereof (referring to the proceeds of the sale of the property) shall be divided equally between E. J. Page, one of the grantors herein, and E. M. Christensen, in pursuance of an agreement heretofore made between said E. M. Christensen and one C. W. Pope, which agreement has heretofore been confirmed and approved by the grantors herein, * * *"

Later, to-wit, August 28, 1928, the "release", hereinbefore quoted, was executed by Christensen to Page. It is contended by respondents and the court found that:

"March 25, 1937, said trust (clearly referring to the trust created by the above mentioned trust deed dated July 7th, 1928) was revoked and terminated and all of said property was, pursuant to the terms of said trust deed, reconveyed to the defendant E. J. Page."

If there was a revocation, as contended, it constituted, in itself, a very definite recognition and acknowledgment of the continuance of Christensen's interest in the property up to March 25, 1937, long after the date of the "release", in that if Christensen had, as Page now insists, released his (Christensen's) interest in the property involved here, there would have been no interest nor trust to terminate or release.

Furthermore, after the release was executed, Whitcomb, who obtained it for Page, at Page's request, cooperated with Christensen in obtaining a compromise settlement for the sum of $1,000.00, of delinquent taxes against the property, of which amount $925.00 was paid by Christensen, Whitcomb advancing $75.00, but doing so only under promise of Christensen to repay it. And, further, it does not appear that, as a matter of fact, Christensen actually received any consideration, monetary or otherwise, for executing the so-called release; and it may be added, that upon the trial of the cause, neither Page nor Pope offered to repay Christensen the amount so paid in settlement of the delinquent taxes, nor for that matter, any of the moneys Christensen expended for labor during the period he was managing the property. "He who comes into equity, must come with clean hands."

In examining the pleadings in this case we find that Page (joined by his wife and Whitcomb) pleaded "that the action of the plaintiff (Christensen) herein, appears to be barred by the provisions of Section 5-204, Idaho Code Annotated, . . ." This plea in bar was neither argued nor briefed, hence it will not be considered. (*State v. Snoderly*, 61 Ida. 314, 319, 101 Pac. (2d) 9; *Carey v. Lafferty*, 59 Ida. 578, 584, 86 Pac. (2d) 168; *Louk v. Patten*, 58 Ida. 334, 343, 73 Pac. (2d) 949; *Thompson v. Walker*, 56 Ida. 461, 464, 55 Pac. (2d) 1300; *Crowley v. Idaho Industrial Training School*, 53 Ida. 606, 26 Pac. (2d) 180; *Winton Lumber Co. v. Kootenai County*, 53 Ida. 539, 26 Pac. (2d) 124; *Harris v. Chapman*, 51 Ida. 283, 5 Pac. (2d) 733; *Merchants Trust Co. v. Davis*, 49 Ida. 494, 290 Pac. 383; Estate of Fisher, 47 Ida. 668, 279 Pac. 291; *McGrath v. West End Orchard*

& *Land Co.,* 43 Ida. 255, 251 Pac. 623; *Farrar v. Parrish,* 42 Ida. 451, 245 Pac. 934; *Nelson v. Johnson,* 41 Ida. 703, 243 Pac. 649; *Hardy v. Butler,* 39 Ida. 99, 226 Pac. 669; *Davenport v. Burke,* 27 Ida. 464, 149 Pac. 511.) The reason therefor, no doubt lies in the fact that this action was commenced just two years and a month from and after respondents contend and insist that Christensen's interest was terminated and the trust revoked, hence, well within the statute.

The Judgment of dismissal entered by the trial court is reversed and the cause hereby remanded with directions to the trial court to make appropriate findings and enter a decree thereon in harmony with the views expressed in this opinion. Costs awarded appellant.

Givens, C. J., and Budge, Morgan and Ailshie, J.J., concur.

## ON PETITION FOR REHEARING
### FILED JULY 9, 1942

HOLDEN, J.— ■ The ground upon which respondents chiefly rely for a rehearing is, that we decided this case "upon an issue which is entirely new, made by the court, and not based upon any allegation in the complaint or in the answer herein."

We turn to the pertinent allegations of the complaint; it alleged in substance: That Pope represented himself to be the equitable owner of the mining property in question; that an agreement was entered into between plaintiff Christensen and Pope by means of correspondence; that it was agreed that Christensen would take over the handling of, and caring for, the mining property; that Christensen:
"was to finance the necessary expense of caring for said property from the sales of personal property then upon said real estate, or from moneys which he might be able to collect from anyone owing money to the Mandarin Mines Corporation; and that in addition to handling and caring for said property, plaintiff was to adjust all matters in connection with the death of a watchman who had recently died while in the employ of the Mandarin Mines Corporation; that in consideration of said services the said defendant Pope agreed to give plaintiff a one-half interest in said property.

"That pursuant to said agreement, the plaintiff immediately thereafter took over the management and entered into possession of said property, secured a settlement in connection with the death of said watchman, made and entered into leases of said property with options to purchase the same; performed a large amount of labor upon said mining claims in the way of annual assessment work and in the development of ore bodies therein, paid taxes assessed against said property in the sum of two thousand, one hundred five and 65/100 dollars, ($2105.65) and in every way carried on the exclusive management and care of said property continuously from the year 1921 to and including the year 1928, up to the date said property was deeded to the defendant E. W. Whitcomb, trustee, as hereinafter more particularly alleged.

. . . .

"That during all of the time hereinbefore mentioned, subsequent to the entering into of said agreement between defendant E. W. Pope and the plaintiff herein, the rights of the plaintiff to a one-half interest in said property and/or the proceeds of the sale thereof, were recognized, approved and confirmed by said defendants E. W. Pope and E. J. Page.

. . . .

"That by virtue of the aforesaid agreement between the plaintiff and the defendant C. W. Pope, and the confirmation thereof by the defendant E. J. Page, as set forth in the said first trust deed, the plaintiff became the equitable owner of an undivided one-half interest in all of said property; and the said property and the proceeds from any sale of said property, or any part thereof, became impressed with a trust for the use and benefit of the plaintiff to the extent of a one-half interest therein; and that the defendant E. Whitcomb, trustee, and any and all of the defendants holding any title thereto, holds the same in trust for the use and benefit of the plaintiff to the extent of a one-half interest therein, and that each of the said defendants who at any time has held title to said property, or proceeds therefrom, or any part thereof, since the month of September, 1921, has held the same in trust for the use and benefit of the plaintiff herein to the extent of a one-half interest in said property."

Pope answered the complaint and admitted certain formal allegations therein, for instance, those alleging the cor-

porate existence of the Condor, Buck Horn, and Treasure companies, and then denied "each and every allegation in plaintiff's complaint contained not hereinbefore specifically admitted."

By a further and separate answer and defense to the complaint, Pope then alleged: that no contract was made between him and Christensen; and upon information and belief, Pope also alleged that Page was the owner of the property.

Page answered and either expressly or in effect denied all the above stated and quoted allegations of the complaint, and expressly alleged that he was the owner of the mining property in question.

It will have been noted plaintiff Christensen alleged: That Pope represented himself to be the equitable owner of the mining property; that an agreement was entered into by correspondence between Pope and himself whereby Pope was to give him a half interest in the property; that by virtue of said agreement "and the confirmation thereof by the defendant E. J. Page", "plaintiff became the equitable owner of an undivided one-half interest in all of said property"; that "the said property and the proceeds from any sale of said property, or any part thereof, became impressed with a trust for the use and benefit of the plaintiff to the extent of a one-half interest therein"; that Whitcomb "and any and all of the defendants [which necessarily included both Pope and Page] holding any title thereto, holds the same in trust for the use and benefit of the plaintiff to the extent of a one-half interest therein." These allegations were denied by respondents.

The issues thereby formed were, First: Ownership of the mining property; that is to say, did Pope or Page own the property? Second: If Pope owned the property, did he contract to give Christensen a half interest therein? Third: Did Page take title to the property in trust for Pope and Christensen?

Those were the issues upon which the case was tried in the trial court, and those were the issues upon which we decided this case, stating them thus:

(1) "Is Pope, in truth and in fact, the owner of the property in question?"

(2) "Did he contract to give Christensen a one-half interest in such property?"

(3) "Did Page take title to the property in trust for Pope and Christensen?"

It follows, then, there is no merit whatever in respondents' contention that we decided this case "upon an issue which is entirely new, made by the court, and not based upon any allegation in the complaint or in the answer herein", nor is there merit in any of the contentions made by respondents in their petition for rehearing; hence, the petition is denied.

Givens, C. J., and Budge and Ailshie, JJ., concur.

MORGAN, J.—While I join in the order denying a rehearing in this case, I am not in accord with the opinion denying it.

When a rehearing has been petitioned for and is denied, nothing is to be gained by adding anything to the order denying it unless the decision is to be modified or clarified. In this case, there is no necessity for an opinion on petition for rehearing.

The nature of the duties of an attorney-at-law are such that a final decision against his client may, at times, so irritate him as to cause him to incorporate statements in his petition for rehearing which he would not use otherwise. The courts should be careful, when this occurs, to avoid perpetuating any feeling of resentment which its decision may have implanted in the mind of counsel. Nothing a court can say, in denying a petition for rehearing, will convince a lawyer he should have lost the lawsuit. The use of caustic language in the petition will not convince the court its decision was wrong, if that end cannot be accomplished by milder means. Controversies between court and counsel can bear nothing but bitter fruit. Therefore, I am not in accord with the opinion on petition for rehearing and, particularly, with the last paragraph of it.

The bench and bar, as well as other people, would do well to heed the sage advice of Will Carleton, in "The First Settler's Story":

"Boys flying kites haul in their white-winged birds;
You can't do that way when you're flying words.
'Careful with fire,' is good advice, we know:

'Careful with words,' is ten times doubly so.
Thoughts unexpressed may sometimes fall back dead;
But God himself can't kill them when they're said!"

(Farm Festivals, p. 18.)