607 P.2d 1070

**BUHL EDUCATION ASSOCIATION and Brent Blackburn, Plaintiffs and Appellants,**

v.

**JOINT SCHOOL DISTRICT NO. 412, TWIN FALLS AND GOODING COUNTIES, and Dr. Harold Hammerquist, Dr. Con Annest, George Atkins, Richard Morris and John Honcik, as the Trustees of Joint School District No. 412, Twin Falls and Gooding Counties, Defendants and Respondents.**

**No. 12504.**

Supreme Court of Idaho.

March 11, 1980.

Robert C. Huntley, Jr., of Racine, Huntley & Olson, Pocatello, Byron J. Johnson, Boise, for plaintiffs and appellants.

John C. Hepworth, of Hepworth, Nungester & Felton, Buhl, for defendants and respondents.

BISTLINE, Justice.

This case involves a dispute between the Buhl Education Association (hereafter the Association) and the Board of Trustees of Joint School District No. 412 (the Board), over the interpretation and application of the statutes governing negotiations between a school district and its professional employees. Idaho Code §§ 33–1271 to 33–1276. The legislature in passing these enactments either failed to observe the interplay of these statutes with I.C. §§ 33–1212, 33–1213[1] or purposefully left the resolution of any conflict for judicial interpretation.

---

1. I.C. § 33–1212:

"During the third full year of continuous employment by the same school district, including any specially chartered district, each certificat-

ed employee named in subsection 2 of section 33–1001, Idaho Code, and each school nurse and school librarian shall be evaluated for a renewable contract and shall, upon having been

Hence the problems created were a matter of first impression for first the trial court and, in turn, this Court.

The complex history of this case began on March 8, 1976, when the Association requested that negotiations begin for the upcoming 1976–77 school year, pursuant to the negotiating agreement between the Association and the Board. This agreement was entered into by the parties in 1972, following the enactment of I.C. § 33–1271,[2] and apparently governed relationships of the parties until the spring of 1976. Negotiations began on March 25 at which time the Association presented its proposed total package. Included in this package was a modification of the negotiating agreement itself.

---

offered a contract for the next ensuing year, having given notice of acceptance of renewal and upon signing a contract for a fourth full year, be placed on a renewable contract status with said school district, until the age of sixty-five (65) years is attained, and subject to the provisions included in this chapter.

"Except as otherwise provided, each such certificated employee, school nurse, or school librarian shall have the right to automatic renewal of contract by giving notice, in writing, of acceptance of renewal. Such notice shall be given to the board of trustees of the school district then employing such person not later than the 1st day of May preceding the expiration of the term of the current contract. Except as otherwise provided by this paragraph, the board of trustees shall notify each person entitled to be employed on a renewable contract of the requirement that such person must give the notice hereinabove and that failure so to do may be interpreted by the board as a declination of the right to automatic renewal or the offer of another contract. Such notification shall be made, in writing, not later than the 10th day of April, in each year, except to those persons to whom the board, prior to said date, has sent proposed contracts for the next ensuing year, or to whom the board has given the notice required by section 33–1213, Idaho Code.

"Any contract automatically renewed under the provisions of this section shall be for the same length of the term stated in the current contract and at a salary no lower than that specified therein, to which shall be added such increments as may be determined by the statutory or regulatory rights of such employee by reason of training, or service, or both.

"Nothing herein shall prevent the board of trustees from offering a renewed contract increasing the salary of any certificated person, from reassigning administrative or supervisory employees to classroom teaching duties with appropriate reduction of salaries from pre-existing contracts.

"Before a board of trustees can determine not to renew the contract of any certificated person whose contract would otherwise be automatically renewed, or to renew the contract of any such person at a reduced salary, such person shall be entitled to a probationary period. This period of probation shall be preceded by a written notice from the board of trustees with reasons for such probationary period and with provisions for adequate supervision and evaluation of the person's performance during the probationary period. Such period of probation shall not affect the person's renewable contract status."

I.C. § 33–1213:

"Upon receiving written notice from the superintendent or other duly authorized officer of the school district showing why the contract of any certificated employee whose contract would otherwise be automatically renewed should not be renewed, or that the contract of any such employee should be renewed but at a reduced salary, as provided in section 33–1212, Idaho Code, the board of trustees shall give a written notice of possible nonrenewal or salary reduction to such employee, along with written notice of the allegations and a hearing to be held before the board. This notice must be given to the affected employee not later than the first day of April preceding the expiration of the term of the employee's current contract. The hearing shall be scheduled to take place not less than thirty (30) days nor more than forty-five (45) days after the receipt of the notice by the employee. The procedures for the hearing itself and the decision of the board shall be consistent with the other procedures specified in section 33–513(4), Idaho Code."

2. I.C. § 33–1271, enacted in 1971 and amended in 1977 by addition of the last sentence, reads:

"The board of trustees of each school district, including specially chartered districts, or the designated representative(s) of such district, is hereby empowered to and shall upon its own initiative or upon the request of a local education organization, enter into a negotiation agreement with professional employees and negotiate with such employees in good faith *on those matters specified* in any such negotiation agreement between the local board of trustees and the local education organization. A request for negotiations may be initiated by either party to such negotiation agreement. Accurate records' or minutes of the proceedings shall be kept, and shall be available for public inspection at the offices of the board of education during normal business hours. Joint ratification of all final offers of settlement shall be made in open meetings." (Emphasis added.)

A total of nine negotiating sessions were held. At the fifth session, on May 3, tentative agreement had been reached on all but one item—salaries. On May 10, the Board decided that on June 9th it would issue new annual contracts for individual teachers. The Association immediately filed a complaint in district court seeking to enjoin the issuance of such individual contracts and to force the Board to comply with the negotiating agreement and statutes related thereto. What turned out to be the final negotiating session was held on June 1, which was the same date the Board filed its answer to the complaint. A hearing on an order to show cause was held June 4, and the court took the matter under advisement.

At what was to be the tenth negotiating session, on June 8, the Association declared an impasse. The negotiating agreement provided for mediation in such an event. The next day, the Board issued the individual contracts as it had planned, and joined with the Association in requesting mediation services.[3] On June 18, the teachers returned their contracts, signed, but most were returned with a cover letter purporting to preserve their rights to negotiation and mediation under the negotiating agreement and the statutes. On June 24th the district court issued a memorandum decision denying the association any relief.

The Board submitted the cover letters to its attorney on July 6. The first mediation session was held the next day. The Association presented its proposed package; there was no discussion of matters directly relating to the individual contracts. A later session was canceled by the Board and no further proceedings occurred other than in court until the following year, as mentioned below.

On counsel's advice, the Board on July 14 wrote to those teachers who had attempted to reserve their rights. The Board's letter stated that the reservation of rights constituted a counter offer, which was rejected, and that new contracts would have to be returned without changes or attachments within eleven days, or the Board would conclude that a teacher not complying had declined offered employment, in which event another teacher would be hired.

The Association then filed an amended complaint. Count I repeated the prior complaint and requested either an injunction against requiring return of the contracts or a declaratory judgment that any contract would be subject to amendment by the provisions of subsequent agreements between the Association and the Board. The claim for relief also requested a writ of mandamus ordering the Board to comply with the statutory procedures of mediation and fact-finding, I.C. §§ 33–1274 and 33–1275.[4]

Count II of the amended complaint alleged bad faith on the part of the board and claimed that the Board should be estopped from reissuing the contracts because it had not in almost a month raised any issue whatever as to the cover letters, but rather

---

3. A joint letter was sent to the Federal Mediation and Conciliation Service.

4. I.C. § 33–1274:

"In the event the parties in negotiations are not able to come to an agreement upon items submitted for negotiations under a negotiations agreement between the parties, one or more mediators may be appointed. The issue or issues in dispute shall be submitted to mediation at the request of either party in an effort to induce the representatives of the board and the representative organization to resolve the conflict. The procedures for appointment of and compensation for the mediators shall be determined by both parties."

I.C. § 33–1275:

"1. If mediation fails to bring agreement on all negotiable issues, the issues which remain in dispute may be submitted to fact-finding by request of either party. One or more fact-finders shall be appointed by the parties by mutual agreement. If such agreement cannot be reached within thirty (30) days of the request for such appointment, the state superintendent of public instruction shall make such appointment. The fact-finder shall have authority to establish procedural rules, conduct investigations and hold hearings during which each party to the dispute shall be given an opportunity to present its case with supporting evidence.

"2. Within thirty (30) days following designation of the fact-finder, he shall submit a report in writing to the respective representatives of the board and the professional employees, setting forth findings of fact and recommendations on the issues submitted."

had proceeded into mediation without objection or comment. This count sought a declaratory judgment that the Board be required to proceed with negotiation and mediation, and that any subsequent agreement would amend the contracts, as in the first count. The Association also sought an order that the return of the contracts be delayed until the court ruled on the merits of the case. An order to show cause issued and hearing was had on July 22, at which time the court refused to enter the requested order, though it was noted that returning the contracts would not waive the right to later relief which might be awarded after a hearing on the merits.

The parties then stipulated that the entire case be submitted for decision on the merits, based on the record before the court and the testimony taken at the two hearings. Findings and conclusions were filed October 7; the district court denied all relief. Judgment was entered October 18, and following the denial of objections filed by the Association, the Association appealed to this Court.[5]

The first issue confronting us is whether there was in effect a negotiating agreement. Both parties agree that a valid negotiating agreement was entered into in 1972 and that it had been complied with until the negotiations in 1976. This contract was, of course, subject to all of the law of Idaho governing contracts.

The Board claims that for a variety of reasons this agreement was no longer in force. First, the Board argues that the agreement was no longer in effect by reason of the final paragraph of the agreement, which reads:

"This Agreement shall be effective upon signing by the presidents of the Association and the Board and shall continue in effect until _____. Modifications of the proposal shall be submitted at least 60 days prior to the date of renewal."

The blank was never filled in with a date. From this, the Board would infer that the agreement was terminable at the option of either party, and that where there is no provision for notice of termination, no notice is necessary. We disagree. The sentence after the blank refers to the date of *renewal*; termination is not mentioned. The agreement thus seems to clearly contemplate that it would be in effect for a given period, at the end of which it would be renewed, perhaps with whatever changes the parties mutually agreed to make.

We see no provision in the agreement for its termination, which we surmise follows from the fact that the sections of the statute cited above appear to mandate that there *shall* be an agreement if it is requested by the Association; there appears to be no choice on the part of the Board whether to enter into an agreement. If a Board may unilaterally terminate an agreement, the statute would have little effect.

The agreement was effective when entered into in 1972 and hence effective thereafter until somehow properly modified. We find no evidence to support any contention that the Board had ever attempted to terminate or modify the agreement,[6] and no

---

5. It has been suggested that this case may be moot, a contention which has been raised. The School District in its brief states "that the second set of contracts were signed and that the 1976–77 school year was completed without further incident. In the spring of 1977 the Association and the Board . . . did enter into a procedures agreement, completed their negotiations and contracts for the year 1977–78 were signed by those teachers desiring to continue in the employment of the District." We have before us nothing from which we might take judicial notice of these facts. In the absence of a motion to dismiss the appeal or some other showing rendering the case moot,

we proceed to decide it, as below. In addition, the Association does correctly point out that "[w]here issues of substantial public interest are presented by an appeal, it should not be dismissed as moot." *Robinson v. Bodily*, 97 Idaho 199, 541 P.2d 623 (1975). We believe that this case is of substantial public interest and a similar case could well arise in the future; hence we proceed to the merits.

6. The superintendent did claim that someone on the board stated at the first meeting that the agreement was terminated. No one from the board or the Association could recall this and we find the testimony of a non-member of the board insufficient to establish it as a fact.

evidence that the Association agreed to any changes. We can only conclude that the agreement was still in effect at the time in question.

The district judge apparently did not feel compelled to specifically decide whether the 1972 negotiation agreement was still in effect. In his first memorandum decision he stated: "I read nothing in [the agreement] that prevents the board from contracting with its professional employees at any time or for any purpose. . . . The evidence before the court at this time will not support a finding that there exists any binding contract between the parties which would prevent the board from contracting with professional employees on subjects and terms mutually acceptable."

 In his second decision, although he did not explicitly repeat the foregoing, the district judge stated as a conclusion of law that the teachers could not be bound by any negotiated agreement, but only by individual contracts, and that the only obligation on the board was to offer and accept contracts containing matters *previously* agreed upon. Such an interpretation could result in allowing the Board to offer individual contracts at any time, so long as any prior negotiated agreements were incorporated, but without regard to any pending negotiations between the Board and the Association.

This rationale misses the very point of collective bargaining, a fine exposition of which was presented in *J. I. Case Co. v. N. L. R. B.*, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). Although that case deals with the National Labor Relations Act (which the Board correctly points out does not apply to a state or its political subdivisions), the theory therein laid out does provide sound guidelines:

"Contract in labor law is a term the implications of which must be determined from the connection in which it appears. Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment. . .

"After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. The employer, except as restricted by the collective agreement itself and except that he must engage in no unfair labor practice or discrimination, is free to select those he will employ or discharge. But the terms of the employment already have been traded out. There is little left to individual agreement except the act of hiring. This hiring may be by writing or by word of mouth or may be implied from conduct. In the sense of contracts of hiring, individual contracts between the employer and employee are not forbidden, but indeed are necessitated by the collective bargaining procedure.

"But, however engaged, an employee becomes entitled by virtue of the Labor Relations Act somewhat as a third party beneficiary to all benefits of the collective trade agreement, even if on his own he would yield to less favorable terms. *The individual hiring contract is subsidiary to the terms of the trade agreement and may not waive any of its benefits . . . .*

"*Individual contracts, no matter what the circumstances that justify their execution or what their terms, may not be availed of to defeat or delay the procedures prescribed by the National Labor Relations Act looking to collective bargaining, nor to exclude the contracting employee from a duly ascertained bargaining unit; nor may they be used to forestall bargaining or to limit or condition the terms of the collective agreement. . . . Wherever private contracts conflict with its functions, they obviously must yield or the Act would be reduced to a futility.*

"It is equally clear since the collective trade agreement is to serve the purpose contemplated by the Act, *the individual contract cannot be effective as a waiver of any benefit to which the employee otherwise would be entitled under the trade agreement.* The very purpose of providing by statute for the collective agreement is to supersede the terms of separate agreements of employees with terms which reflect the strength and bargaining power and serve the welfare of the group. Its benefits and advantages are open to every employee of the represented unit, whatever the type or terms of his pre-existing contract of employment.

". . . The workman is free, if he values his own bargaining position more than that of the group, to vote against representation; but the majority rules, and if it collectivizes the employment bargain, individual advantages or favors will generally in practice go in as a contribution to the collective result. We cannot except individual contracts generally from the operation of collective ones because some may be more individually advantageous. Individual contracts cannot subtract from collective ones, and whether under some circumstances they may add to them in matters covered by the collective bargain, we leave to be determined by appropriate forums under the laws of contracts applicable . . .

". . . We know of nothing to prevent the employee's, because he is an employee, making any contract provided it is not inconsistent with a collective agreement or does not amount to or result from or is not part of an unfair labor practice. But in so doing the employer may not incidentally exact or obtain any diminution of his own obligation or any increase of those of employees in the matters covered by collective agreement." (Emphasis added)

321 U.S. at 334–39, 64 S.Ct. at 579–81, 88 L.Ed. at 766–68.

Although the merits of the case concerned another issue, the force and validity of these collective bargaining statutes were observed in *School District No. 351 Oneida County v. Oneida Education Association*, 98 Idaho 486, 567 P.2d 830 (1977).

By insisting of the teachers that they return the individual contracts without attaching conditions thereto, and before negotiations or subsequent mediation could proceed to fruition, the Board was enabled to push through contracts which did not embody terms and provisions which might result from the Association negotiating effort. We hold that the district court erred in concluding the Board could do so. The fact that the terms of the collective bargaining agreement may not be settled and reduced to a written binding contract at the time of the proffering of individual teacher contracts is immaterial. The school boards and teachers may offer and accept employment subject to the terms of a collective bargaining agreement yet to be agreed upon by the parties.[7]

The main issue squarely presented here is whether under the circumstances of this particular case a school board, currently engaged in collective bargaining negotiations, or in mediation, with the association representing its teachers, may send out binding individual contracts to teachers as required by statute. We hold that a school board may do so, but hold further, consistent with the views above expressed, that those contracts become and are modified by applicable provisions of the agreement which thereafter results from negotiations and mediation which were timely brought

---

7. Exhibit "R" is one of the teachers' individual contracts which were sent out pursuant to the provisions of I.C. § 33–1212. Although bearing date of 15 July, it is an employment contract *"for the school term commencing on or about August 23, 1976* and consisting of a period of 190 days . . ."

The contract is a form prepared pursuant to I.C. § 33–513, and states thereon, paragraph 5, "that this contract is subject to the applicable laws of the state of Idaho . . ." Such laws include I.C. § 33–1271, et seq.

and on-going when the individual contracts were entered into.

The judgment of the district court is reversed, and the cause remanded for further proceedings in accordance herewith, noting that we observe the suggestion of mootness advanced in this Court, but the disposition of which we leave for the trial court should that proposition be further pursued.

Reversed and remanded. Costs to appellant.

DONALDSON, C. J., and BAKES and McFADDEN, JJ., concur.

SHEPARD, Justice, dissenting. .

I deem it important to keep in mind what this case is all about. To the majority its importance seems to be that an agreement to agree is a "contract" but a formal written contract is not really a contract, but by decision of this Court magically becomes open ended and subject to future negotiation. Perhaps more important is what this case does not involve. The majority opinion does not discuss nor find any fault with the facts as found by the trial court and so obviously the case does not involve facts. Further, in my opinion, the case does not involve orthodox and traditional labor law regulated by congressional enactments [NLRB] nor the philosophy of decisions interpreting those statutes.

The majority opinion relegates the issues of mootness to a footnote wherein Finding No. X and Conclusion of Law No. S of the trial court which find and conclude the issue of mootness are ignored by the majority opinion. Finding No. X states:

"Sometime after August 1, 1976, [and presumably before the date of the signing of the Findings and Conclusions, to wit: October 7, 1976] Joint School District No. 412 entered into employment contracts for the 1976–77 school year with individual teacher members of the Buhl Education Association and all teaching positions in the District are now filled."

[Thereafter the district judge specifically invited comment from counsel stating, "If either party objects to its inclusion in these findings, please advise me within five days of receipt of the findings, and I will strike Finding X and start all over again." No party objected to the inclusion of said Finding.]

Conclusion of Law No. S states:

"Any questions regarding terms and conditions of employment contracts for the 1976–77 school year are presently moot by virtue of Finding X. Any mediation would be moot as it could not affect existing contracts for the 1976–77 school year."

The majority opinion characterizes the "negotiating agreement" between the parties as a "contract" and states, "This contract was, of course, subject to all of the law of Idaho governing *contracts*." On the other hand, the trial judge in his carefully drafted Memorandum Opinion and Conclusions of Law pointed out, and I believe correctly, that the Professional Negotiations Act envisages three agreements or contracts in the conduct of successful collective bargaining. He points out in Conclusion of Law J that it is

"simply a mutually-acceptable 'game plan' in which the parties spell out the specific topics or matters they are willing to *consider* and *discuss* in their coming *negotiations* and the rules of *procedure* the parties are willing to follow during the contemplated *negotiation* process. * * * Its obvious purpose is to set some reasonable limits on the agenda or topics the parties will be *discussing* and *negotiating*."

In short, such a "contract" is not a contract at all, in my judgment, but simply an indication that the parties are willing to discuss and negotiate and seek to arrive at a "contract" sometime in the future. To make matters even more confusing, it is my understanding of the record that the plaintiff Education Association submitted to the board a fifty-five page document for negotiation which, in part at least, purports, by its own terms, to supersede any negotiating agreement of 1972.

The majority decision abruptly changes horses in the mid stream of its opinion

**24**

when it considers the "contracts" entered into by the board and its professional employees. As I understand the majority, it states those "contracts" are not really "contracts" at all, but rather some shadow type arrangement between each individual professional employee and the board that some type of employment is offered and accepted, but however subject to every conceivable variable which may thereafter be negotiated between the board and the Education Association to which the teacher may or may not belong. Those variables implicit in the majority's reference to the NLRB and labor negotiations in the private sector may very well include wages, hours of employment, classroom size, participation in management and supervision, participation in curricula, union or closed shop, and almost any other item under the sun which might or might not have been contained in the proffered fifty-five page list of demands. To state, as I understand the majority, that documents executed between the board and its individual professional employees are "contracts" but are subject to every conceivable change in modification at some point in the future dependent upon "negotiations" is to me the height of illogic and the ignoring of the most basic tenets of the law of contract. As stated by the trial court in its Conclusions of Law, "It is Hornbook Law that no existing contract between A and B is amended or modified by a contract between A and X. Or, to put it another way, no existing employment contract between defendants and a teacher is amended or modified by a contract between defendants and the plaintiffs negotiated in the future."

In my judgment, the welter of conflicting statutes and theories in the State of Idaho which relate to the tenure of teachers, the hiring or non-hiring of teachers, the representation of teachers and mandatory negotiations between boards and teacher representatives, together with the various time elements involved, must, as was suggested by the learned trial judge here, have been drafted by Lewis Carroll.

It is my further belief that the majority's reference to the statutes and cases relating to the National Labor Relations Board and the traditional and orthodox concepts of collective bargaining in the private sector cannot serve but to further sow the seeds of confusion. Those concepts are founded in congressional enactments and it is more than arguable that Congress has no such authority to legislate in the area of state and local government employees. *See National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); *see generally* Gee, A Survey Analysis of Collective Bargaining in the Public Schools, 15 Willamette L.Rev. 366 (1979).

My view of the record indicates that a controversy arose in early 1976. The controversy was resolved as between the professional employees and the Board between August 1 and October 7 of 1976, when all positions were filled by the acceptance of contracts. In my judgment, at some time this Court will have to enter this never-never land and resolve the conflicting statutes and concepts, but the instant case is a poor vehicle. Its wheels were lost four years ago.

I would dismiss for mootness.