657 P.2d 1

Terry GILBERT, Walter Roberts, Al Blacklock, Gayle Moore, Charlotte Gunn, Sherry Silvers, Karen Blacklock, Dean Hayashida, Dave Mortimer, Mary Harmon, Jan Lenker, Peggy Grant, Mike Bierman, Bob Thompson, Glen Knapp, Rafael Ortez and Eleanor Stoffer, on behalf of themselves and all others similarly situated, Plaintiffs, Counter-defendants and Respondents,

v.

NAMPA SCHOOL DISTRICT NO. 131, and the Board of Trustees of Nampa School District No. 131, Defendants, Counter-claimants and Appellants.

No. 13106.

Supreme Court of Idaho.

Jan. 12, 1983.

William F. Yost, III, Nampa, for defendants, counter-claimants and appellants.

Byron J. Johnson, Boise, for plaintiffs, counter-defendants and respondents.

BISTLINE, Justice.

The Nampa Education Association is a local education organization which, at all times relevant to this appeal, was the exclusive representative of teachers of Nampa School District No. 131 pursuant to I.C. § 33–1273.[1] *See* I.C. §§ 33–1271 to –1273.

---

1.  I.C. § 33–1273 provides:

    "The representative organization designed or selected for the purpose of negotiations by the majority of the professional employees in a school district shall be the exclusive representative for all professional employees in that district for purposes of negotiations. *Provided, however, that the individual or individuals selected to negotiate for the professional employees shall be a member of the organization designated to represent the professional employees and shall be a profes-*

The Association represented the teachers in negotiations with the Board of Trustees, which operates the District, and these negotiations produced a written negotiations agreement entered into between the Board and the Association on July 22, 1974.[2] The agreement, which was ratified by both the Board and the Association, includes section 4–1, which provides:

"4–1 The statutory responsibilities of the Board of Trustees are not subject to negotiation. The negotiation committees shall consider the school calendar, salaries, hours of employment and fringe benefits. It is understood and agreed that a cost of living adjustment will be granted as a part of the economic benefits that will be determined pursuant to this agreement. Such cost of living adjustment shall be based upon the consumer price index for the previous twelve month period as determined from March 1 to the last day of February, or such other index as mutually agreed upon. It is further understood and agreed that the Board will in good faith provide the cost of living adjustment for each year that this agreement is in effect, together with other financial matters to be negotiated, so long as such adjustment, when considered with all economic demands of the Association, shall be in accordance with sound fiscal management and in conformance with statutory responsibilities and responsible budgeting processes. Such revision shall be calculated upon the B.A. step 1 level of the current salary schedule and that calculated amount shall be applied to each step in the salary schedule. Following the ratification of the above items by both parties, including the item(s) as determined in Section 5, Paragraph 2, continuing contracts may be issued by the Board of Trustees. Moreover, upon mutual consent, contracts may be issued without full resolution of the above items."

In conformance with the negotiations agreement representatives for the Association and the District attempted to negotiate an employment contract for the 1975–76 school year. During these negotiations a dispute arose regarding the amount of the cost of living increase to which the teachers were entitled under section 4–1. Impasse was reached and pursuant to the negotiations agreement the parties participated in mediation. Unable to resolve their differences through mediation, the parties submitted the matter to a fact-finder in conformance with the negotiations agreement. Upon conclusion of the fact-finding process, an agreement still had not been reached by the parties.[3]

Before an agreement was reached the teachers engaged in a work stoppage by failing to report for work on the first two days scheduled according to the school calendar adopted by the District. These days were scheduled primarily for teacher orientation and were later made up by the teachers. A tentative agreement was reached between the Board and the District on August 28 and the teachers returned to work on the day classes were scheduled to begin. The agreement incorporated the fact-finder's recommendation that the teachers receive an 8.72% cost of living increase, but was subject to the condition that the Association could file a lawsuit to interpret the language in section 4–1 concerning the cost of living adjustment.

The Association did file a lawsuit alleging that the Board failed to act in good faith by failing to provide according to section 4–1 of the negotiations agreement a cost of

sional employee of the local school district. A local board of trustees shall negotiate matters covered by a negotiations agreement only with the representative organization designated by the professional employees of a school district."

2. The Board is empowered to and required to enter into such a negotiations agreement by I.C. § 33–1271. *See Buhl Education Associa-*

*tion v. Joint School District No. 412,* 101 Idaho 16, 607 P.2d 1070 (1980).

3. Both the negotiations agreement and the statutes governing the negotiation process provide for fact-finding and mediation. *See* I.C. §§ 33–1274 and –1275. The fact-finding and mediation processes, however, are not binding upon the parties.

living increase equal to the rise in the consumer price index. The Association requested that the court order the Board to grant an 11.1% cost of living increase. The suit by the Association, however, was dismissed, the court holding that the Association "ha[d] no power to sue on behalf of the teachers of the district."

The present suit is a class action on behalf of the teachers of the district. In their complaint the teachers alleged that the Board failed to act in good faith by granting only an 8.72% cost of living increase and sought a judgment awarding a cost of living increase of 11.1%, plus interest, attorneys' fees and costs. The Board and the District answered denying the allegations in the complaint and alleging as an affirmative defense that the class action was barred by the doctrines of *res judicata* and collateral estoppel. In a pretrial memorandum decision, the district court held that the class action was not barred by the principles of *res judicata* or collateral estoppel, and, in addition, held that attorney's fees could be awarded to the class of teachers pursuant to I.C. § 12–121. Following trial, the court found that the Board acted in bad faith in its negotiations with the teachers and by only granting an 8.72% cost of living increase. The court held that the claims of the teachers were supported by the alternate theories of contract and equitable estoppel, and entered a judgment awarding the teachers an 11.1% cost of living increase, plus attorney's fees and costs. The Board and the District perfected this appeal from the judgment.

### I.

The appellants argue that the court's dismissal of the earlier suit by the Association was a decision on the merits of the same issues raised in the present case. Thus, they argue that because the class of teachers is in privity with the Association, this class action is barred by the doctrine of *res judicata*.[4]

The doctrine of *res judicata* is generally invoked "to bar a subsequent suit by the same parties or their privies *upon the same cause of action.*" *Pocatello Industrial Park Co. v. Steel West, Inc.,* 101 Idaho 783, 786, 621 P.2d 399, 402 (1980) (emphasis in the original). It applies, however, only if an existing final judgment has been rendered upon the merits of a case. *See Wilson v. Bittick,* 63 Cal.2d 30, 35, 45 Cal. Rptr. 31, 34, 403 P.2d 159, 162 (1965); *McBride v. State,* 626 P.2d 760, 761 (Colo. App.1981); *Beard v. Maynard,* 223 Kan. 631, 637–38, 576 P.2d 611, 615–16 (1978); *Flick v. Crouch,* 434 P.2d 256, 261 (Okl. 1967).

The appellants in this case rely on I.R. C.P. 41(b) to support their contention that the dismissal of the earlier suit was a decision on the merits. Rule 41(b) provides in part:

> "Unless the Court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits."

The appellants argue that pursuant to I.R. C.P. 41(b) the earlier dismissal should operate as a decision on the merits since the court in the earlier case "did not specify that the decision should not operate as an adjudication on the merits, nor was the dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19."

We agree with appellants' contention that the dismissal of the earlier suit was neither for lack of jurisdiction, for improper venue, or failure to join a party under I.R.C.P. Rule 19. We cannot agree, however, that the court in the earlier case failed to specify that its decision was not on the merits of the issues presented. In the action brought by the Association, the district court specifically ruled that the Associ-

---

4. The appellants also list as an issue whether the district court erred in holding that the class action was not barred by the principles of collateral estoppel. However, appellants presented no argument on this issue and therefore we will not consider it on appeal.

ation could not bring an action on behalf of the teachers.[5] We believe that the district court's specific holding that the Association was not a proper plaintiff to bring a suit based upon the negotiations agreement is sufficient to take the case out of Rule 41(b).[6] Therefore, we hold that the decision dismissing the suit by the Association did not operate as a decision on the merits. Consequently, this class action is not barred by the principles of *res judicata*. *See Wilson, supra; McBride, supra; Beard, supra; Flick, supra.*

## II.

The appellants argue that even if the class action was properly brought, the district court erred in holding that the teachers were entitled to an 11.1% cost of living increase.

## A.

█ The appellants contend that the Board's decision regarding the amount of the teachers' cost of living increase was a discretionary act not subject to judicial review. In support of this contention, appellants cite *Enterprise, Inc. v. Nampa City,* 96 Idaho 734, 536 P.2d 729 (1975), and other cases for the proposition that acts of an elected body are not subject to review by the judiciary unless the actions of that body are so fraudulent, corrupt, arbitrary or unreasonable as to amount to an abuse of the body's discretion.

We do not agree that the rule set forth in *Enterprise* applies under the circumstances in this case. This case cannot properly be characterized as one involving a purely discretionary act on the part of the Board. In this case, the Board was required by statute to negotiate in good faith those items listed in the negotiations agreement. *See* I.C. § 33–1271. Furthermore, the Board was bound by the provisions of the negotiations agreement to provide in good faith the cost of living increase, "so long as such adjustment, when considered with all economic demands of the Association shall be in accordance with sound fiscal management and in conformance with statutory responsibilities and responsible budgeting processes."[7] Since the Board in this case had contractual and statutory duties to negotiate and to provide a cost of living increase based upon the consumer price index if certain conditions were met, it was within the authority of the district court to determine whether the Board complied with these duties.

## B.

The appellants also contend that the district court's finding that the Board acted in bad faith in negotiating with the teachers and by granting only an 8.72% cost of living increase is clearly erroneous. Several arguments are provided in support of this contention.

5. The court stated:
    "With reference to Defendant's claim that the Plaintiff has no power to sue on behalf of the teachers of the district, I have examined the statute and find no statutory authority empowering the Education Association to sue on behalf of the teachers. As I stated in my previous Memorandum, their only statutory authority is to negotiate on behalf of the teachers. I also notice that there is nothing in the complaint that alleges any authorization for this action coming from the teachers of the Nampa School District empowering the Association to do so."
    Although the district court went on to state there was not "a final or binding contract" between the parties, because of its earlier ruling any consideration of the substance of the Association's complaint was purely dicta. Furthermore, although the court was correct in

stating that the negotiations agreement was not a final contract in the sense that the Board was *absolutely* bound to provide a cost of living increase equal to the rise in the consumer price index, the court never considered the substance of the claims that the Board negotiated in bad faith and failed to grant the cost of living increase despite the fact that the conditions specified in the negotiations agreement were met.

6. We find it unnecessary in this opinion to decide whether the district court was correct in ruling that the Association was not a proper plaintiff to bring a suit based upon the negotiations agreement, and we therefore decline to express any opinion in that regard.

7. The effect of the negotiations agreement will be discussed further in part IV, *infra.*

## 1.

■ The appellants initially argue that if the "step increases" and fringe benefits which are included in the salary schedules are considered, the record demonstrates that the teachers received an increase in excess of the 11.1% rise in the consumer price index. Thus, they contend that the Board actually complied with its duty under the negotiations agreement by offering the teachers what was termed a 7.5% salary schedule. This proposal granted a 7.5% cost of living increase and added an additional step to each column of the salary schedule, a change not demanded or even requested by the Association. The appellants presented this argument to the district court, which found it to be evidence of the Board's lack of good faith and an attempt to avoid payment of the cost of living increase. The district court stated:

"The defense witnesses [who argued that the Board had granted a cost of living increase equal to 11.1%] were talking about 'step increases' in pay scales negotiated in prior years which were paid on the basis of the increased educational status of a teacher or on longevity or both. Clearly, these increments were in no way cost of living increments."

We agree with the district court that step increases and fringe benefits did not constitute cost of living increases under the negotiations agreement. The wording of the negotiations agreement clearly demonstrates that the cost of living adjustment was a separate and distinct consideration. The disputed provision specifically provides: "It is understood and agreed that a cost of living adjustment will be granted *as a part of the economic benefits that will be determined* pursuant to this agreement." (Emphasis added.) The provision further provides that "the Board will in good faith provide the cost of living adjustment for each year that this agreement is in effect, *together with other financial matters* to be negotiated . . . ." (Emphasis added.) (The

other financial matters which were to be negotiated included salaries and fringe benefits.) Under the circumstances, we cannot agree with the appellants' contention that in addition to the cost of living increase other economic benefits should be considered in determining whether the Board satisfied its obligation under section 4–1. We therefore hold that the Board did not satisfy its duty to grant a cost of living increase by proposing the 7.5% salary schedule or by granting an 8.72% cost of living increase.[8]

## 2.

The appellants also argue that because the wording of the cost of living provision was conditional and the parties understood it to be so, the district court erred in finding that the agreement was evidence of the Board's bad faith. The appellants point out that the district court considered the fact that a representative of the Board characterized the conditional language in section 4–1 as "weaseling words," and found that "[t]here was definitely an attempt on the part of the Board representatives at the time the agreement was made not to abide by the agreement in any strict way." The appellants argue: "It was clear error on the part of the trial court to interpret the negotiations agreement language which both parties hammered out, understood and approved as conditional, to be the unilateral bad faith act of one party."

■ We agree with the appellants' contention that the cost of living provision was conditional. We cannot agree, however, that the district court found the *language* of the agreement to be evidence of bad faith on the part of the Board. Nor can we conclude that the provision's conditional nature precluded a finding by the district court of bad faith. Although the language of the cost of living provision was conditional, under the provision the Board was bound to provide in good faith a cost of living

8. The 8.72% cost of living increase which was granted did not include the additional step originally included in the proposed 7.5% salary schedule. As a result, the increase was funded with an almost identical number of dollars as would have been required to fund the original 7.5% salary schedule.

increase equal to the rise in the consumer price index if the conditions specified in the negotiations agreement were met. Furthermore, under I.C. § 33–1271 the Board was required to negotiate the cost of living increase in good faith.[9] In our opinion, the district court did not rely solely on the language of the negotiations agreement to justify its finding of bad faith on the part of the Board. Rather, the court relied upon the actions of the Board and its representatives in negotiating and in granting a cost of living increase of 8.72% to support its finding.

### 3.

■ Appellants argue that the district court erred in finding that the Board failed to negotiate in good faith. However, we find substantial and competent evidence to support the district court's finding. The Board's initial proposal was presented to the Association on May 27, 1975.[10] The proposal, which was described as a 7.5% salary schedule, provided for a 7.5% cost of living increase and an additional step on each column of the salary schedule. James W. Bieker, the business manager of the district testified that the Board's decision to offer the 7.5% salary schedule to the Association instead of granting a straight cost of living increase was "very arbitrarily" made. Robert A. Burns, assistant superintendent, testified that he understood that the District's basic commitment was to meet the rise in the cost of living, which they had

determined to be approximately 11%. He further testified, however, that they chose to meet their commitment by offering the 7.5% salary schedule. Rex Engleking, superintendent of the District, testified that from the time the budget was proposed until the time the 7.0 mill override levy failed (June 26, 1975), the Board had the money to offer an 11.1% cost of living increase but did not do so. This evidence clearly supports the district court's finding that the Board did not negotiate the cost of living adjustment in good faith as required by the statute. Because there is substantial and competent, although conflicting, evidence to support the trial court's finding, we will not disturb that finding on appeal. *See* I.R.C.P. 52(a); *Cougar Bay Co. v. Bristol,* 100 Idaho 380, 597 P.2d 1070 (1979).

### 4.

■ The evidence also demonstrates that the Board did not provide the cost of living increase in good faith as required under section 4–1 of the negotiations agreement. The record demonstrates that approximately $45,000 in addition to the money used to fund the 8.72% increase would have been necessary to fund the full 11.1% increase. The trial court found:

"That [the money necessary to fund a full cost of living increase] under sound budgeting practices could have been allocated to a cost of living increase for the teachers in full compliance with Section

---

9. I.C. § 33–1271 provides:

"The board of trustees of each school district, including specially chartered districts, or the designated representative(s) of such district, is hereby empowered to and shall upon its own initiative or upon the request of a local education organization, enter into a negotiation agreement with professional employees and negotiate with such employees in good faith on those matters specified in any such negotiation agreement between the local board of trustees and the local education organization. A request for negotiations may be initiated by either party to such negotiation agreement. Accurate records or minutes of the proceeding shall be kept, and shall be available for public inspection at the offices of the board of education during normal business hours. Joint ratification of all final

offers of settlement shall be made in open meetings."

10. Although the budget was adopted by the Board, the record demonstrates that members of the Board had little input in its preparation. Members of the Board testified that they relied heavily on the advice and recommendations of superintendent Engleking and members of his staff. In fact, one member of the Board testified that prior to the time that the budget was presented to them by Engleking there were no discussions by the Board as to matters included in the budget, such as the amount to be provided to the teachers. The budget presented to the Board contained the 7.5% salary schedule, the only offer actually made to the teachers prior to the completion of the fact-finding process.

4–1 of the negotiations agreement from several different sources of funds, including without limitation reductions in budget for non-essential items, elimination of budget items having lower priority than the priority for cost of living increases covered by the negotiations agreement, revenues received in substantial amounts over and above revenues projected from the foundation program and transportation program comparing the school year 1974–75 with 1975–76 and other sources of funds established in the record."

There is ample evidence in the record to support the district court's finding that if the Board had eliminated or reduced nonessential items in the budget the full cost of living increase could have been granted consistent with sound budgeting practices. The budget adopted by the District included funds for four programs which had not been funded by the District prior to the 1975–76 school year.[11] The cost of these four programs was approximately $110,000.[12] Although during the negotiation process the District proposed to delete these programs if the override election failed, these programs were given priority over the teachers' cost of living adjustment. James Bieker testified that all four programs were fully funded before the District considered the amount of money which would be available for the teachers. Although the appellants argue that only through hindsight could the Board *know* that there was money available to grant the full cost of living increase without curtailing any educational programs, the Board did not promise to grant the cost of living increase only if it did not have to cut any programs. The Board was required to grant the increase if it was "in accordance with sound fiscal management and in conformance with statutory responsibilities and responsible budgeting processes." [13]

The evidence demonstrates that the District knew it would receive additional unanticipated funds prior to the time it finally approved the negotiations package and thereby supports the district court's finding that the full cost of living increase could have been granted. After fact-finding, the only offer made by the Board was for an 8.72% cost of living increase calculated on the base salary. This offer did not include the additional step which was included in the 7.5% salary schedule originally proposed by the Board. As a result, the District was able to fund the 8.72% increase with an almost identical number of dollars as would have funded the original proposal of 7.5% with an extra step—the difference between the two proposals being only approximately $6,000. A tentative agreement including the 8.72% cost of living increase was reached between the negotiating teams of the Board and the Association on August 28, 1975. This agreement, however, included a provision under which the teachers retained the right to file a lawsuit to obtain an interpretation of section 4–1. The Association's membership voted to accept the negotiations package on August 28, 1975, but the package was not officially approved by the Board until September 8. In the interim, the 6.3 mill override levy was approved.

11. The four programs were Home Economics Related Occupations (HERO), Secondary Curriculum Committee Stipends, Resource Teachers, and staff members for the Vocational Educational Building.

12. The dollar amounts allocated for the individual programs were $10,000 for HERO, $10,000 for Secondary Curriculum Committee Stipends, $40,000 for Resource Teachers, and $50,000 for staff members for the Vocational Education Building.

13. During the trial the district court ruled that section 4–1, the provision in the negotiations agreement concerning the cost of living adjustment, was ambiguous. The court therefore admitted parol and documentary evidence to explain the intent of the parties in entering into the negotiations agreement. That evidence included testimony by representatives of the Association that they believed the Board was bound under section 4–1 to grant a full cost of living increase unless it absolutely could not do so. In addition, Terry Gilbert testified that the District's attorney, who participated in the drafting of the conditional language contained in section 4–1, characterized the language of section 4–1 as "a promise by the Board [to provide the cost of living increase] unless the Board simply could not find [it]."

Although the budget originally adopted by the Board included $231,000 in funds which would have been generated by a 7.0 mill override levy, Superintendent Engleking testified that had the 6.3 mill override levy failed, the Board and the District would have met the 8.72% increase. The 6.3 mill override levy which was approved on September 4 generated funds only $23,000 less than those which would have been generated by a 7.0 mill override levy. The override levy election was certified prior to the Board's final approval of the negotiations package.[14] In addition, prior to the time the Board finally approved the negotiations package, the District's business manager, James Bieker, testified that they became aware that the estimate of revenue from state funds was low. Despite these facts, the Board made no further offer of a cost of living increase. If the Board could have funded the 8.72% cost of living increase without funds from an override levy, it is hard to understand why it could not have granted, in accordance with responsible budgeting, a full 11.1% cost of living increase, requiring only an additional $45,-000, once it knew that additional funds would certainly be available.

Because we find substantial and competent evidence to support the district court's finding that a full 11.1% cost of living increase could have been granted by the District in accordance with responsible budgeting practices, we sustain it. See I.R.C.P. 52(a); *Cougar Bay, supra.*

### C.

The appellants also argue that the trial court erred in its application of the clean hands doctrine. The appellants contend that "[a]mple evidence was introduced at trial to show that plaintiffs did not come

before the court with clean hands." Thus, they argue that the judgment in favor of the teachers should be reversed.

The evidence chiefly relied upon by the appellants to support this contention was that the teachers, including Association president Terry Gilbert, made public statements during the negotiation proceedings in violation of the negotiations agreement [15] and that the teachers engaged in a work stoppage. Additional facts cited by the appellants as evidence of the teachers' unclean hands are that the teachers initially asked for a 14% cost of living adjustment and that they engaged in a variety of unfair bargaining tactics.

■ The clean hands doctrine is a well-established principle to which this Court has long subscribed. *See Malcolm v. Hanmer,* 64 Idaho 66, 127 P.2d 331 (1942). Simply stated the maxim stands for the proposition that "a litigant may be denied relief by a court of equity on the ground that his conduct has been inequitable, unfair and dishonest, or fraudulent and deceitful as to the controversy in issue." *See* 27 Am.Jur.2d Equity § 136 (1966) (footnotes omitted). The clean hands doctrine, however, "is not one of absolutes and [it] should be applied in the court's discretion, so as to accomplish its purpose of promoting public policy and the integrity of the courts." *Id.* (Footnote omitted.) Thus, the fact that a party has engaged in inequitable conduct will not always result in that party being denied relief under the clean hands doctrine.

"[The clean hands doctrine] is not a judicial strait jacket; it does not require that those who invoke equity should have led blameless lives, or operate so as to repel all sinners from a court of equity, nor does it apply to every unconscientious act

14. The Board approved the negotiations package in executive session on August 28. However, official action was not taken until the Board's regular meeting on September 8. Prior to approving the negotiations package at that meeting the Board certified the 6.3 mill override election.

15. Section 5–6 of the negotiations agreement provides:

*"Public Releases:* The parties agree that during the period of negotiations and prior to reaching an agreement to be submitted to the Board and the Association, the proceedings of the negotiations shall not be released unless agreed to by both parties. Should impasse be agreed to by both parties, public releases may be made by either party following notification to the other party."

of a party .... [E]quity will consider the conduct of the adversary, the requirements of public policy, and the relation of the misconduct to the subject matter of the suit and to [the] defendant.

. . . .

". . . The conduct of a party may be such as to prevent the maxim from being applied at his instance, as where he does not himself come with clean hands, where he has been guilty of conduct more unconscionable or unworthy than that of his opponent, or where he invited or waived the misconduct of which he complains." 30 C.J.S. Equity § 98 (1965) (footnotes omitted).

■ The trial court in this case considered the claims of the appellants and found that representatives of the Association did make public statements during the budget hearing and that some of the teachers did engage in a work stoppage. The trial court, however, concluded that the conduct of the teachers when compared with that of the Board and the District was not so unconscionable as to justify denying relief. The court's conclusion was based in part upon its belief that the conduct relied upon by the appellants to justify the application of the clean hands doctrine against the teachers resulted, at least in part, from the inequitable conduct of the Board and the District. In light of the district court's findings that the Board acted in bad faith in its negotiations with the teachers and by failing to grant a full cost of living increase, we do not believe the trial court abused its discretion in not denying relief to the teachers on the basis of the clean hands doctrine.

### III.

In its decision awarding the teachers a full cost of living increase the district court relied primarily on the doctrine of equitable estoppel, and alternatively on a contract theory. Appellants argue that neither theory supports the relief granted to the teachers. We cannot agree.

Appellants argue that the teachers are not entitled to recover upon a theory of contract because the legislatively mandated negotiations agreement is not a contract, but rather merely a "game plan" for negotiations—an agreement to later negotiate. Appellants cite several district court cases in support of this proposition.[16] These cases, however, were decided before this Court's recent decision in *Buhl Education Association v. Joint School District No. 412,* 101 Idaho 16, 607 P.2d 1070 (1980).

In *Buhl* this Court held that although a school board may send out binding individual employment contracts to teachers during ongoing collective bargaining negotiations or mediation, "those contracts become and are modified by applicable provisions of the agreement which thereafter results." *Id.* at 22, 607 P.2d at 1076. This holding lays to rest arguments that negotiation agreements are not binding contracts.

■ Although we agree with the appellants that in most cases negotiation agreements are simply "agreements to later negotiate," we cannot agree that as such, they cannot be binding contracts. If the parties to an agreement agree to negotiate certain subjects or to follow certain proce-

---

**16.** Appellants also rely upon a memorandum decision of the district court entered on April 14, 1977, prior to the final judgment. In that decision the district court stated: "Plaintiffs' complaint particularizes allegations of defendants' purported 'bad faith' by quoting language from an alleged negotiation agreement. Such an agreement could hardly be construed as a contract in the legal sense. Rather, it is a 'game plan' mandated by the legislature."

The memorandum decision upon which appellants rely was entered in response to the defendants-appellants' motion to dismiss. The district court construed the plaintiffs' com-

plaint as an action seeking to enforce the Board's duty under I.C. § 33–1271 to negotiate in good faith concerning the subject matter of the negotiations agreement. The court's final memorandum decision and findings and conclusions entered on March 22, 1978, relied upon the alternate grounds of contract and equitable estoppel to justify recovery by the teachers, apparently reversing the court's earlier memorandum decision. The district court's final judgment, however, controls over any conflict in its earlier memorandum decisions. *See Terry v. Terry,* 70 Idaho 161, 213 P.2d 906 (1950); *Clark v. Clark,* 58 Idaho 37, 69 P.2d 980 (1937).

dures in negotiating, they are bound to do so. The parties' mutual promises to negotiate according to the agreement constitute consideration for the negotiations agreement. *See Eastern Idaho Production Credit Association v. Placerton, Inc.,* 100 Idaho 863, 606 P.2d 967 (1980). Thus, although a negotiations agreement is not a final contract of employment, *see Buhl,* 101 Idaho at 21–22, 607 P.2d at 1075–76 (*quoting J.I. Case Co. v. N.L.R.B.,* 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944)), it does represent a binding contract between the parties as to the items agreed upon therein.

■ The appellants argue that the teachers should not be entitled to recover upon a theory of contract because "the only reason for which any part of the negotiations agreement was entered into at all by the Board was that it was *statutorily* bound to do so by Idaho Code, Section 33–1271." Thus, the appellants contend that the forced participation of the Board could not result in an enforceable contract. We do not agree.

As the district court noted, the procedures set forth in I.C. §§ 33–1271 to –1276 reflect the legislature's determination that structured negotiation procedures would benefit not only school districts and teachers, but the public as well. By these procedures the legislature has specifically empowered and required the board of trustees of each school district to enter into a negotiations agreement. *See* I.C. § 33–1271, *supra* note 9. Although the Board was required in this case to enter into a negotiations agreement with the Association, nothing in the statutes required the Board to agree to the inclusion of a cost of living provision in that agreement. The district court specifically found that the Association relinquished its position that principals be included in their bargaining unit "in consideration of the addition of the provision in the negotiations agreement for a cost of living increase." That finding is clearly supported by the testimony of the parties.

Under the circumstances it would be inappropriate to hold that the Board's promise to provide a cost of living increase if certain conditions were met was unenforceable because it resulted from forced participation.

■ We note that the cost of living clause contained in the negotiations agreement in this case is perhaps unusual. By agreeing to provide a cost of living adjustment if certain conditions were satisfied, the Board went beyond agreeing to later negotiate on certain specified subjects or to follow certain procedures. We believe, however, that it was within the Board's authority to enter into such an agreement. I.C. § 33–1271 empowers the board of trustees of each school district to "enter into a negotiations agreement with professional employees." I.C. § 33–1271 does not specify, or in any way limit, what may be contained in such an agreement. It is for the legislature, not this Court, to place limitations upon the things to which the parties may agree in a negotiations agreement. In light of the absence of any limitations in I.C. § 33–1271, we hold it was within the Board's authority to agree to the cost of living clause in the negotiations agreement.

In summary, an enforceable contract was entered into between the Board and the Association—the exclusive representative of the teachers.[17] The findings of the district court that the Board did not fulfill its commitment under the negotiations agreement by failing to provide an 11.1% cost of living increase is supported by substantial and competent evidence. The district court therefore did not err in ordering the Board to "compensate the plaintiffs in such amounts as to award the plaintiffs a cost of living increase in pay for 1975–76 school year to the full amount of the United States Department of Labor Consumer Price Index, *i.e.,* 11.1% to be calculated on step 1 of the B.A. level . . . ." Because we uphold the judgment in favor of the teachers on the basis of contract, we find it unnecessary to determine whether the dis-

17. The teachers, as third-party beneficiaries of the negotiations agreement, were entitled to bring an action to enforce the contract.

trict court was correct in concluding that the judgment was also supported by a theory of equitable estoppel.

### IV.

Appellants finally argue that the district court erred in granting the teachers attorney's fees pursuant to I.C. § 12–121. Under I.C. § 12–121 the district court is empowered to award reasonable attorney's fees to the prevailing party in any civil action. The appellants have not demonstrated that the award of attorney's fees to the teachers in this case constituted an abuse of the district court's discretion, and therefore the award is affirmed.[18] *Anderson v. Ethington,* 103 Idaho 658, 659, 651 P.2d 923, 924 (1982); *White v. Rehn,* 103 Idaho 1, 3, 644 P.2d 323, 325 (1982); *Odziemek v. Wesely,* 102 Idaho 582, 583, 634 P.2d 623, 624 (1981); *Tanner v. Estate of Cobb,* 101 Idaho 444, 446, 614 P.2d 984, 986 (1980); *Levra v. National Union Fire Insurance Co.,* 99 Idaho 871, 590 P.2d 1017 (1979).

### V.

Respondents argue that the teachers should be awarded attorney's fees on appeal pursuant to I.C. § 12–121. Because this Court is not left with the abiding belief that this appeal was brought frivolously, unreasonably or without foundation, no attorney's fees will be granted. I.R.C.P. 54(e)(1); *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 591 P.2d 1078 (1979).

The judgment is affirmed. Costs to respondents.

DONALDSON, C.J., McFADDEN, J., and McQUADE, J. (Ret.), concur.

McFADDEN, J., registered his vote prior to his retirement on August 31, 1982.

BAKES, Justice, dissenting:

I cannot agree with the majority's handling of the bad faith issue. I do not feel that the evidence presented in this case justified a finding of bad faith on the part of the school board.

A negotiations agreement is not a final contract of employment. *Buhl Education Ass'n v. Joint School Dist. No. 412,* 101 Idaho 16, 607 P.2d 1070 (1980). However, under the facts of this case, the school board probably did bind itself to provide a cost of living increase measured by the Consumer Price Index. The wording of this particular negotiations agreement is specific enough, regarding the expression of an intent to give a cost of living increase based upon the Consumer Price Index, to justify that finding by the trial court, even though the agreement is rendered somewhat ambiguous by the last portion of the provision in question, as set out below. Where a written contract is ambiguous, the trial court is entitled to determine the intent of the parties, and I believe there is sufficient evidence here to sustain the trial court's finding that the teachers were entitled to an 11.1% increase, and I would affirm the trial court's decision if that were the full extent of the decision. However, the trial court went beyond that point and found the board acted in bad faith. I cannot agree with this finding, or with approval given by the majority.

There are three major factors present in this case that contribute to my refusal to join with the majority on the bad faith issue. The first factor appears in the negotiations agreement itself. It says that a cost of living adjustment will be granted:

"as a part of the economic benefits that will be determined pursuant to this agreement. Such cost of living adjustment shall be based upon the consumer price index for the previous twelve month period as determined from March 1 to the last day of February, or such other index as mutually agreed upon. It is further understood and agreed that the Board will in good faith provide the cost of living adjustment for each year that this agreement is in effect, together with oth-

---

18. The judgment in this case was entered prior to this Court's adoption of I.R.C.P. 54(e), effective March 1, 1979. Rule 54(e) now governs the awarding of attorney's fees made pursuant to I.C. § 12–121.

er financial matters to be negotiated, *so long as such adjustment, when considered with all economic demands of the Association, shall be in accordance with sound fiscal management and in conformance with statutory responsibilities and responsible budgeting processes.*" (Emphasis added.)

The trial court continually referred to the emphasized language as "weasel words." To the trial judge, the presence of this wording in the negotiations agreement seemed to constitute bad faith on the part of the board. This conditional language, inserted in and agreed to by both parties in the negotiations agreement, was intended to give the board an "out", but such an "out" is necessary if we are to leave to individual school boards the responsibility for determining their own school budgets.

Another factor present here is that the teachers themselves recognized that the school board might have to give them a lower increase than they felt they were entitled to. An agreement was reached between the teachers and the board on August 28, with the teachers agreeing to an 8.72% cost of living increase, subject to their right to file this lawsuit to interpret the language of the negotiations agreement.

The third and most important factor was the budget of the school district itself. During the negotiations, everyone, including the school board, assumed that a cost of living increase would be granted. One teacher indicated that Mr. Yost, negotiating for the board, said that "there was room to negotiate toward a cost of living adjustment; there were parameters to move within, but, it did not equal the cost of living." The same teacher also testified that Mr. Burns, an assistant superintendent of the school district, told the teachers that if a 7-mill override levy were passed the salary proposed near 11% with no additional step increase could be granted. This indicates that the board was proposing salary increases that would fit within the budget of the school district.

The teachers and the trial judge seemed very willing to tell the school board how it could balance *its own budget* in order to give the teachers their full cost of living increase. The teachers' suggestions ranged from eliminating programs (not staffing a building already built, elimination of resource teachers whose salaries had previously been funded by federal grant, etc.) to delaying purchase of a building to house district headquarters, and even to reducing the school week to four days.

The trial judge noted that money to fund a cost of living increase could be found by "reductions in budget for non-essential items, elimination of budget items having lower priority than the priority for cost of living increases . . . ." The majority opinion then condones the trial court's method of *second guessing* the board in holding that the money for the increase was available *if the board had eliminated or reduced non-essential items in the budget.* If this opinion is allowed to stand, then the courts will be running the school districts. The authority to determine what items should be included in a school district's budget is by law granted to the school board, and district courts (and teachers) should not be able to rule, in hindsight, that the board "could have" granted the cost of living increase if they had only reduced or eliminated some other program.

The majority opinion also attempts to second guess the board on the amount of funding that would be available to it for that budget year. It is clear that the board did not have available to it the full amount of budget moneys until after an agreement with the teachers had been entered into (when a 6.3 mill levy passed). This Court, or a district court, should not be allowed to second guess, in hindsight, a board of trustees as to the amount of funding available to them to grant budget increases.

My objection in this case is similar to the objection made in *School Dist. No. 351 Oneida County v. Oneida Education Ass'n,* 98 Idaho 486, 567 P.2d 830 (1977). In a dissent in that case I wrote:

"This effectively means that the final arbiters in wage negotiations between teachers and school districts are going to be the courts who must decide whether the parties are negotiating in good faith, imposing or withholding the court's injunctive powers based upon the outcome of that finding. I doubt the wisdom of placing the courts in such a position. It is not every social ill which can be resolved by the courts. It is my considered view that, in the absence of legislation holding otherwise, our society would be better served in most instances by a rule which permitted teachers to strike and school boards to negotiate within the statutory framework, whether in good or bad faith, letting economic and other social factors finally forge the conclusion of that conflict, rather than interjecting the courts into the fray where the threat of an injunction dangles over the head of teachers, but only if, in the opinion of the court, the school board has negotiated in good faith."

If the majority opinion is allowed to stand as written, district courts will be allowed to substitute their judgment for that of the school board in determining the amount of funding available to a particular school district, in deciding what essential or non-essential programs to cut, and in determining what priority each program should be given. District courts, in intervening in this manner, will effectively be running the school districts. As I indicated in the *Oneida* case, there is little wisdom in placing the courts in such a position. Consequently, I would reverse the trial court in its finding on the bad faith issue.