861 P.2d 88

**Melvin R. HOOPES and Ardell C. Hoopes, husband and wife, Plaintiffs–Respondents,**

v.

**Lowell J. HOOPES, Defendant–Appellant.**

No. 19855.

Court of Appeals of Idaho.

Sept. 21, 1993.

Hoopes & Thompson, Rexburg, for defendant-appellant.

Mark B. Clark, Pocatello, for plaintiffs-respondents.

PERRY, Judge.

This appeal is based on an action by Melvin and Ardell Hoopes, husband and wife, against Lowell and Loni Hoopes, husband and wife.[1] Melvin acted as a cosigner and guarantor on a promissory note for his brother Lowell. Melvin pledged four certificates of deposit as security for the loan.

Lowell eventually defaulted on the loan, and the certificates of deposit were seized to satisfy the loan. Melvin brought this action to recover the loss. At trial, the district court, sitting without a jury, determined that Melvin had acquired all the rights of the lending bank through subrogation. The district court found Lowell liable for the amount paid by Melvin on the loan, for interest on the money owed and for attorney fees. On appeal, Lowell challenges the district court's conclusion that Melvin was entitled to recover on a subrogation theory, the calculation of interest on the debt and the award of attorney fees. Melvin, in turn, requests attorney fees on appeal.[2] We affirm the subrogation ruling but conclude the district court erred in calculating interest due. We therefore remand in part for a redetermination of the interest component of the judgment and the amount of awardable attorney fees.

## FACTS AND PROCEDURAL BACKGROUND

In December of 1982, Zion's National Bank of Utah foreclosed on a farm owned by Lowell. In October 1983, Lowell told Melvin that his redemption rights under Idaho law would expire on December 15, 1983, and that he was having difficulty obtaining a loan to redeem the property. In an attempt to aid Lowell in obtaining financing, Melvin agreed to cosign on a loan from the First Bank of Afton, Wyoming. He also agreed to assign four bank deposits evidenced by certificates of deposit (the "CDs") to the bank as collateral. Lowell received approximately $270,000 from the bank, and a six-month note in favor of the bank was signed by Lowell and Melvin. Melvin alleged that Lowell agreed to sell or mortgage the farm to pay the loan within the six months allowed. At the end of the six months, Lowell was

---

1.  Because both parties have the same last name, we will refer to appellants Lowell and Loni Hoopes collectively as "Lowell" and respondents Melvin and Ardell Hoopes as "Melvin."

2.  Melvin also asks us to reverse the district court's ruling that the "security agreement" held by Melvin in Lowell's farm was lost because it

expired by its own terms. Because no cross-appeal was filed on this issue, we will not consider it here. If a respondent wishes reversal of a portion of the court's judgment, respondent must make the request by way of cross-appeal. *Lepel v. Lepel,* 93 Idaho 82, 87, 456 P.2d 249, 254 (1969).

unable to pay off the loan and received an extension, paying only the accrued interest at that time. Lowell subsequently obtained several extensions of the note. During the course of these extensions, Melvin made a number of interest payments on the note in order to protect his CDs from forfeiture. A renewal note in the amount of $290,838.13 was signed by Lowell and co-signed by Melvin in May 1986. At that time, Melvin re-pledged the CDs as security and signed a guarantee of the loan. The final extension was granted by the bank in August of 1987, extending the maturity date of the loan to February 22, 1988. However, on October 15, 1987, American National Bank (formerly First Bank of Afton, Wyoming) was closed by the Federal Deposit Insurance Corporation. On March 10, 1989, the CDs were seized by the FDIC and used to satisfy the loan. On that date, the promissory note was marked "paid in full."

Melvin filed suit to collect the amount that was paid to discharge the debt plus interest. At trial, the district court determined that by virtue of his payment via the CDs, Melvin had gained all the rights of the bank through subrogation. The district court ordered Lowell to pay $290,-838.13 as the principal of the debt; $257,-295.26 in pre- and post-default interest; and $18,544.19 for interest payments that were made by Melvin (interest was waived on this amount), making a total judgment of $566,678.58. The district court also ordered Lowell to pay attorney fees under the terms of the note and because it found the defense of the case "frivolous" under I.C. § 12–121 and I.R.C.P. 54. Based on a contingency agreement (one-third of the total judgment) between Melvin and his attorney, the attorney fees award was $188,-892.86. Lowell filed this appeal, claiming that it was error for the lower court to find that Melvin was subrogated to the rights of the bank, that the interest was improperly calculated and that the district court erred in awarding attorney fees.

**I.**

The first issue raised is whether the district court properly found that Melvin became subrogated to the right of the bank when the CDs were used to pay off the loan.

In support of the district court's determination of the right of subrogation, Melvin first points to Article 3 of the Uniform Commercial Code as adopted in Idaho. Melvin cites former I.C. § 28–3–415 for the proposition that as an "accommodation party," he has a right of recourse against Lowell.[3] Former I.C. § 28–3–415 states:

**Contract of accommodation party.**—(1) An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it.

.    .    .    .    .

(5) An accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse on the instrument against such party.

There is no dispute that the loan was made for Lowell's benefit and that he was the primary obligor on the loan. Melvin, as the cosigner of the note, was the "accommodation party." Hawkland & Lawrence, UCC Series § 3–415:02 (1986). Without Melvin's signature and the pledge of the CDs, Lowell would not have been able to obtain the loan. Lowell was thus the "accommodated party."

In the Comment to Official Text of the former § 28–3–415 is the following:

5. Subsection (5) is intended to change the result of such decisions as *Quimby v. Varnum*, 190 Mass. 211, 76 N.E. 671 (1906), which held that an accommodation indorser who paid the instrument could not maintain an action on it against the accommodated party since he had no "former rights" to which he was remitted. Under ordinary principles of suretyship the accommodation party who pays is subrogated to the rights of the holder

---

**3.** Although this code section has been modified and renumbered as I.C. § 28–3–419, effective

July 1, 1993, the former statute is applicable to this case.

paid, and should have his recourse on the instrument.

Through subsection (5), Melvin has a "right of recourse" against Lowell for the money paid. Melvin asserted at trial that he was subrogated to all of the rights of the bank, as provided in the note, not merely the right to collect the principal. The district court agreed and awarded interest and attorney fees based on the provisions of the promissory note.

■ In addition to rights under Article 3 of the UCC, Melvin also seeks to support the district court's subrogation determination by invoking the common law right of subrogation. Given the adoption of Article 3 in Idaho and the attendant statutory rights of subrogation applicable to this case, we would normally not need to consider the common law of subrogation. Because Lowell has raised on appeal a number of common law defenses to subrogation, however, we deem a discussion of subrogation under the common law necessary. Common law subrogation is an equitable principle, based on the theory that one (the subrogee) who is compelled to pay for the debts or damages caused by another should have a right to recover from the person incurring the debt or causing the damage. *May Trucking v. Int'l Harvester, Co.*, 97 Idaho 319, 543 P.2d 1159 (1975). By paying off the creditor (the subrogor), the subrogee acquires all the rights possessed by the subrogor.

> Subrogation, in its broadest sense, is the substitution of one person for another, so that he may succeed to the rights of the creditor in relation to the debt or claim and its rights, remedies and securities.... It is considered a creature of equity and is so administered as to secure real and essential justice without regard to form, and it will not be allowed where it would work an injustice to others.... The doctrine of subrogation is not administered as a legal right but the principle is applied to subserve the ends of justice and to do equity. It does not rest on contract and no general rule can be laid down which will afford a test in all cases for its application, and whether

the doctrine is applicable to any particular case depends upon the peculiar facts and circumstances of such case.

*Houghtelin v. Diehl,* 47 Idaho 636, 639–40, 277 P. 699, 700 (1929).

■ One who claims to be equitably subrogated to the rights of a creditor must satisfy certain prerequisites: (1) payment must be made pursuant to an obligation to do so, or in order to protect the subrogee's own interest, i.e., the subrogee must not be making the payment as a mere "volunteer." *Williams v. Johnston,* 92 Idaho 292, 298, 442 P.2d 178, 184 (1968); (2) the debt paid must be one for which the subrogee was not primarily liable; and (3) the entire debt must be paid. *Houghtelin, supra* 47 Idaho at 640, 277 P. at 700, (1929); *Cozzetto v. Wisman,* 120 Idaho 721, 726, 819 P.2d 575, 760, (Ct.App.1991). Finally, (4) the subrogation must not work any injustice to the rights of others. *Houghtelin, supra.* See generally, *Caito v. United California Bank,* 20 Cal.3d 694, 144 Cal.Rptr. 751, 576 P.2d 466 (1978).

Lowell asserts that the district court erred in finding subrogation for three reasons. Lowell claims that Melvin cannot be given subrogation rights because he failed to plead subrogation in his complaint; that Melvin did not come to the action with "clean hands," and, therefore, Melvin is barred from seeking an equitable remedy; and, finally, that as a "volunteer," Melvin was unable to be subrogated to the bank's rights.

■ We first consider the issue of whether Melvin is barred from obtaining the bank's rights through subrogation when he did not plead it in either the original or amended complaint. A review of the amended complaint reveals that Melvin did not specifically allege that he acquired the bank's rights through "subrogation." He did, however, plead general facts that indicated Melvin had provided security for and guaranteed a loan made to Lowell, that the security provided was used to pay off the loan when it became delinquent and that he was entitled to recover from Lowell. Pleadings that fail to claim a right under a

theory of subrogation, but allege the essential elements for the application of subrogation, are sufficient. *George L. Schnader, Jr. Inc. v. Cole Bldg. Co.*, 236 Md. 17, 202 A.2d 326, 330 (1964). Equitable subrogation derives from the equitable power of the courts and it should be "administered to ensure real and essential justice without regard to form." *Houghtelin v. Diehl*, 47 Idaho 636, 639, 277 P. 699, 700 (1929); *Cozzetto v. Wisman*, 120 Idaho 721, 726, 819 P.2d 575, 580 (Ct.App.1991). Because sufficient facts were alleged in the complaint to give rise to subrogation, and because those facts were established at trial, the district court did not err in finding liability on the theory of subrogation. *See Barnard & Sons, Inc. v. Akins*, 109 Idaho 466, 708 P.2d 871 (1985); *Cady v. Pitts*, 102 Idaho 86, 625 P.2d 1089 (1981) (equitable remedies fashioned for appropriate relief on facts presented).

■ Lowell next contends that subrogation, as an equitable remedy, is unavailable to one who brings the action with "unclean hands." Lowell alleges that Melvin's true desire was to possess the farm and that the entire lawsuit was merely an attempt to gain title. The Idaho courts have long subscribed to the principle that "he who comes into equity must come with clean hands," and "a litigant may be denied relief by a court of equity on the ground that his conduct has been inequitable, unfair and dishonest, or fraudulent and deceitful as to the controversy in issue." *Gilbert v. Nampa Sch. Dist. No. 131*, 104 Idaho 137, 145, 657 P.2d 1, 9 (1983), *quoting* 27 AM.JUR.2D *Equity* § 136 (1966). Nevertheless, the clean hands doctrine "is not a judicial straight jacket; it does not require that those who invoke equity should have led blameless lives, or operate so as to repel all sinners from a court of equity, nor does it apply to every unconscientious act of a party." *Gilbert*, 104 Idaho at 145–46, 657 P.2d at 9–10 *quoting* 30 C.J.S. *Equity* § 98 (1965). We think that application of the clean hands doctrine must be based upon a litigant's conduct, not upon his or her private motivations. In this case, regardless of Melvin's motivation for becoming a surety for Lowell, we can

find nothing inequitable in his paying the loan, nor in his attempts to recover the money lost on the delinquent loan. Melvin did take an "assignment" of the farm in 1983. The assignment purports to be given as security for payment of the 1983 note. Melvin attempted to enforce this assignment in the litigation. Although the trial court found the assignment unenforceable for having expired by its own terms, it was not inequitable or dishonest for Melvin to seek some security in return for guaranteeing Lowell's debt of over $290,000 or to attempt to enforce the security interest after Lowell's default caused the loss of Melvin's bank deposits. We perceive no grounds for application of the clean hands doctrine against Melvin.

■ Lowell also asserts that Melvin could not gain the bank's rights through subrogation because he was a "volunteer." The question of volunteer status is one of law, to be determined by the court, and is subject to free review on appeal. *Kawai Farms, Inc. v. Longstreet*, 121 Idaho 610, 613, 826 P.2d 1322, 1325 (1992); *Employers Mut. Fire Ins. Co. v. Piper*, 335 S.W.2d 925 (Ky.1960); *See Standards of Appellate Review* § 3.2, IDAHO APPELLATE HANDBOOK (Idaho Law Foundation, Inc., 1985).

■ As stated above, one prerequisite to obtaining rights through subrogation is that the subrogee must pay the debt to protect his or her own interest or by virtue of a binding obligation. If there is no such interest to protect, or no prior obligation to pay, then the act of payment is merely voluntary and no rights through subrogation will arise. Lowell asserts that because Melvin had no prior obligation or interest to protect when he pledged his CDs and cosigned on the loan, his actions were voluntary. This assertion, however, misconstrues the "volunteer" element of subrogation. The question of the subrogee's volunteer status is determined *at the time the debt must be paid*, not when the initial surety obligation arises. The surety or guarantor's status as compensated or gratuitous makes no difference. *Arkansas Power & Light Co. v. Fidelity & Casualty*

*Co,* 197 Ark. 187, 121 S.W.2d 890 (1938); *Lewis v. United States Fidelity & Guar. Co.,* 144 Ky. 425, 138 S.W. 305 (1911); *Gilbertson v. Northern Trust Co.,* 53 N.D. 502, 207 N.W. 42 (1925); 73 AM.JUR.2D *Subrogation* § 55 (1974). Therefore, the reason that Melvin cosigned on the loan and pledged the CDs is irrelevant. The only question is whether or not he made the payment pursuant to an obligation or to protect an interest. In this case, the bank held the CDs which were involuntarily used to pay off the debt. The obligation to act as a surety arose when Melvin signed the note and the CDs were used as collateral. Thus, when the note was paid, it was pursuant to a pre-existing obligation. Under these circumstances, the claim of voluntary payment simply cannot be maintained. The district court was correct in determining that Melvin was not a "volunteer" and subrogation was, therefore, proper.

We conclude that the district court properly found Melvin to be subrogated to the rights of the lending bank.

## II.

■ We next consider whether the district court correctly calculated and awarded interest on the debt owed to Melvin. Under the provisions of the note, interest on the principal accrued at 7.37 percent until the maturity date and 21 percent after maturity. The note was extended a number of times, the final extension being given on August 14, 1987, with a maturity date of February 22, 1988. The district court's order of February 6, 1992, simply awards $10,955.36 for interest "prior to default" and $246,339.90 for interest "after default." In its findings of facts and conclusions of law on the record, the district court found that the default date of the loan between the bank and Lowell was February 22, 1988.

Lowell contends, however, that prior to March 10, 1989, the date the CDs were seized, no debt was owed by Lowell to Melvin. Therefore, any award of interest prior to March 10, 1989, is improper. We agree.

In paragraph 2 of the judgment against Lowell and Loni Hoopes, the district court ordered an award of "Interest prior to default on the note in the sum of Ten Thousand Nine Hundred Fifty-five Dollars and thirty-six cents ($10,955.36) and after default in the sum of Two Hundred Forty-six Thousand Three Hundred Thirty-nine Dollars and ninety cents ($246,339.90)." Melvin was not subrogated to the interest of the bank, and did not acquire rights under the note, until the FDIC seized the CDs on March 10, 1989. Melvin, therefore, is not subrogated to the bank's right to interest on the note accrued prior to that date, except to the extent that he actually paid such interest to the bank. Melvin did make occasional interest payments in 1985, 1986 and 1987 totalling $38,241.19. He was given judgment for that amount in addition to the loan principal (less reimbursements Lowell made directly to Melvin for those interest payments totalling approximately $19,700). In discharging the promissory note of May 5, 1986, the bank marked the note "paid in full 3/10/89." The bank wrote off the remaining interest accrued before March 10, 1989. A subrogee stands in the shoes of the subrogor, and gets no more rights than those held by the subrogor. *Int'l Equip. Serv., Inc. v. Pocatello Indus. Park,* 107 Idaho 1116, 1119, 695 P.2d 1255, 1258 (1985). Since Melvin did not pay that written-off interest, and did not take an assignment of the bank's right to collect it, Melvin is not entitled to receive such interest from Lowell. It was error to award interest for any time prior to March 10, 1989.

■ Lowell also contends that the district court should not have calculated the interest award at the post-maturity rate of 21 percent, as called for in the note. With this proposition, however, we cannot agree. Under the UCC, an accommodation party has the right to enforce the instrument according to its tenor, including any provision for attorney fees and interest. *Ilg v. Andrews,* 10 Wash.App. 936, 520 P.2d 1385, 1388 (1974); Hawkland & Lawrence UCC Series § 3–415:13 (1984). The district court, therefore, was correct in calculating

**524**

interest at the rate stated on the note of 21 percent.

### III.

The final issues for our consideration are whether attorney fees were properly awarded in this case and whether such fees should be awarded on appeal.

Under the terms of the note, "Except where prohibited by law, Borrower promises to pay all costs of collection, including but not limited to reasonable attorney's fees thereto paid or incurred by the Lender on account of such collection, whether or not suit is filed with respect." As decided above, the provisions of the note are enforceable against Lowell by Melvin as a subrogee to the lending bank. Therefore, the award of attorney fees as provided in the note was proper.

The district court also held that attorney fees were awardable under I.C. § 12–121 and I.R.C.P. 54(e)(1), finding the defense of the case to be frivolous and without merit. Because the note provided for an attorney fee award, we need not address whether the district court abused its discretion in making an award under I.C. § 12–121. Where a trial court's award of attorney fees can be upheld upon one of several grounds found by the lower court to support the award, appellate review of the other grounds is not necessary. *Fox v. Board of County Commissioners*, 121 Idaho 684, 827 P.2d 697 (1992).

Having found a proper basis to make an award of attorney fees, it is then up to the district court to set the amount. In this case, the award of attorney fees was based on a contingency agreement between Melvin and his attorney and amounted to $188,-892.86, one-third of the damages award. Because we have decided above that interest cannot be awarded prior to March 10, 1989, and because the award of attorney fees is based on the amount of judgment, we uphold the awarding of attorney fees but must remand for a recalculation of the fees based on the amended judgment.

Respondent Melvin has also asked for attorney fees on appeal according to the terms of the note. The district court's award of attorney fees was based on a contingency fee agreement and we have remanded for a recalculation of that award. In *Phillips v. Miles*, 116 Idaho 842, 780 P.2d 593 (Ct.App.1989), this Court held that the amount of attorney fees awarded at trial is an appropriate factor to consider in determining the award of attorney fees on appeal under subsection (3) of I.C. § 12–120. This reasoning also applies to attorney fees awarded at trial based on a contract. If the district court again uses the contingency agreement to calculate the attorney fee award, part of that determination should include the efforts on appeal and whether that amount adequately compensates Melvin's attorney for his efforts on appeal as well. I.R.C.P. 54(e)(3)(L). We believe it would surpass a "reasonable" fee to award both the one-third amount given below and additional fees on appeal. We note for clarity that this does not mean that in any case where an award of attorney fees is based on a contingency agreement, the amount is necessarily limited to the amount under the contingency agreement. Our decision here only means that an award based on a contingency agreement *may* be enough to subsume any amount that might be awarded on appeal. Ultimately, the determination of the reasonableness will rest with the trial court after it has recalculated the interest award and reconsidered all the factors under I.R.C.P. 54(e)(3). Therefore, we decline to make a specific award of attorney fees on appeal and instead order the district court to consider the efforts of Melvin on appeal when fixing the reasonable fee under the note.

The judgment is affirmed as to the finding of subrogation, the post-maturity interest rate applied and award of attorney fees; reversed as to award of interest prior to March 10, 1989, and remanded for recalculation of interest and attorney fees.

WALTERS, C.J., and LANSING, J., concur.